ESTATE of Northern J. CALLOWAY, individually and on Behalf of LMN Productions, Inc., Plaintiff,

v.

The MARVEL ENTERTAINMENT GROUP, A DIVISION OF CADENCE INDUSTRIES CORP., et al., Defendants.

The MARVEL ENTERTAINMENT GROUP, a DIVISION OF CADENCE INDUSTRIES CORP., et al., Third–Party Plaintiffs,

v.

DUMLER & GIROUX, the Shukat Company, Ltd., et al., Third–Party Defendants.

No. 82 Civ. 8697 (RWS).

United States District Court, S.D. New York.

Sept. 17, 1991.

Ronald W. Gill, Brooklyn, N.Y., for Estate of Calloway.

Carney & McKay, by Robert B. McKay, of counsel, New York City, for defendants Marvel Entertainment Group and Peter S. Shukat.

Ray L. LeFlore, pro se.

Stults & Marshall, by Sol V. Slotnick, New York City, for defendants Shukat Co. and SCL.

Michael B. Klein, DDS, pro se.

## OPINION

SWEET, District Judge.

On remand The Marvel Entertainment Group, a division of Cadence Industries Corp. and certain individual defendants

(collectively "Marvel") and Dumler & Giroux, the Shukat Company, Ltd., and Peter Shukat (collectively "Shukat") have moved to impose sanctions in the amount of $100,000 against the estate of Northern J. Calloway ("Calloway") and his former counsel Raymond L. LeFlore ("LeFlore"), jointly and severally. The motion is granted.

*Prior Proceedings*

Calloway, represented by LeFlore, commenced this action in December 1982 seeking recovery of an aggregate amount of $66 million against Marvel and other defendants for infringement of Calloway's copyright in a work entitled *The Skyrider* by making unauthorized changes in it and distributing it to certain third parties without proper authorization. Marvel maintained that certain written agreements, dated June 8, 1981, signed by Calloway authorized their acts.

In the spring of 1984, the Marvel defendants moved for summary judgment on the basis of the June 8, 1981 agreements. Calloway opposed the motion, claiming that Calloway's signature on the June 8, 1981 agreements had been forged.

By the July 3, 1984 decision, the motion was denied in an opinion which also stated:

Calloway has by a narrow margin put sufficient facts in contention to withstand defendants' summary judgment motion. However, Calloway should be aware that this court has awarded attorney's fees against a plaintiff who was found after trial to have pursued a claim in bad faith and without factual support ... The Court will not hesitate to award such costs if the facts are found after trial to warrant such an award.

After a six-week jury trial and a defendants' verdict on May 13, 1986, defendants moved for sanctions as they had repeatedly warned Calloway and LeFlore that they would. Sanctions were imposed by this court in its decision of August 1, 1986 in the amount of $200,000 against Calloway and the law firm of Pavelic & LeFlore ($100,000 against each). The Marvel defendants were awarded costs as well. 111 F.R.D. 637 (S.D.N.Y.1986). Later, in its decision of December 23, 1986, the August

1 decision with respect to the award of $100,000 in sanctions as against Pavelic & LeFlore, was amended by imposing $50,000 in sanctions as against Ray L. LeFlore individually and $50,000 against Ray L. LeFlore and Pavelic & LeFlore, jointly and severally. 650 F.Supp. 684 (S.D.N.Y.1986).

LeFlore and Pavelic & LeFlore filed an appeal, *pro se.* Marvel filed a cross-appeal, seeking an increase in the amount of sanctions that had been imposed against LeFlore, his firm and Calloway.

In a decision dated August 12, 1988, the Second Circuit affirmed this court's imposition of sanctions as against the attorneys. At the same time, the panel retained jurisdiction of any further appeals in this case (854 F.2d 1452, 1483), and stated that:

... we are *sua sponte* recalling the mandate and reinstating Calloway's appeal in order to remand for a determination of the relative responsibility of Calloway and his attorneys for the conduct violating Rule 11 and the allocation of sanctions between them.

854 F.2d at 1473.

The Second Circuit found that there was a clear conflict of interest in Calloway's having been represented in the Rule 11 proceeding by LeFlore and his law firm, vacated the $100,000 in sanctions as against Calloway, remanding this matter back to this court with the following instructions, among others:

The propriety of the portion of the Rule 11 sanctions imposed on the attorneys, $100,000 is thus clear. Less clear, however, is the liability of the attorneys for the $100,000 imposed solely upon Calloway, and we now remand for consideration of that issue. If on remand Judge Sweet decides not to reimpose some or all of the $100,000 sanctions on Calloway, a question then arises under the cross-appeal as to whether the attorneys should be made liable for the amount from which Calloway is then relieved in light of the fact that a finding of diminished responsibility on Calloway's part appears to imply increased responsibility on the attorneys' part. Even if on remand Calloway remains liable for some

or all of the sanctions, we believe a question exists as to the appropriateness of joint and several liability of the attorneys for that amount.

We believe these interrelated questions should be addressed as follows. We now affirm the $100,000 in sanctions imposed on the attorneys. On the remand that we have ordered in Calloway's reinstated appeal, Judge Sweet, applying the legal standards described above, should determine what portion, if any, of the $200,000 total sanctions is the responsibility of Calloway and impose either no sanctions on him or an appropriate amount between zero and the $100,000 originally imposed. If he revises the sanctions against Calloway from the $100,000 originally imposed, he should then consider whether the attorneys should be liable for that portion of the $100,000 no longer outstanding as to Calloway. We believe this is an issue fairly raised by the Marvel defendants' cross-appeal that seeks, *inter alia*, an increase in the sanctions imposed on the attorneys. The issue must be remanded, however. Judge Sweet's balancing of the numerous pertinent factors has now been undone by our remand of Calloway's appeal, and Judge Sweet should determine in the first instance the appropriate total mix of sanctions (in addition to the $100,000 affirmed) in the proceedings on remand.

854 F.2d at 1477.

At page 1466 of its decision, the Second Circuit stated:

Neither Calloway nor LeFlore submitted an affidavit in opposition to the motions for sanctions, leaving all factual issues to be decided on the existing record.

and permitted limited supplementation of the existing record upon the remand:

Calloway should also be allowed to make a factual submission in addition to the present record regarding his responsibility for the facsimile claim if he chooses. The attorneys may of course answer that submission.

\* \* \* \* \* \*

To some extent, the financial resources of the attorneys may be relevant to the remanded questions, and Pavelic and Le-Flore should be allowed to supplement the record on that issue notwithstanding their failure to offer such evidence originally.

854 F.2d at 1478.

Thereafter, Pavelic & LeFlore, the law firm, was granted *certiorari* in the Supreme Court, which determined that Rule 11 did not permit sanctions to be imposed against a law firm, but only against an individual attorney citation. It otherwise left undisturbed the imposition of sanctions as against LeFlore. LeFlore himself did not seek *certiorari* in the Supreme Court.

The Estate of Northern J. Calloway is now a party to this action in place of the deceased Northern J. Calloway.

The Court of Appeals on June 13, 1990 filed its mandate in the district court, directing:

that the matter be remanded to the District Court for further proceedings consistent with the opinion of this court [854 F.2d 1452 (1988)] as modified by the opinion of the Supreme Court [493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989)].

On the same day a pretrial conference was held and the parties were directed to complete discovery by August 15 and to submit a pretrial order on August 25, 1990. Requests by the parties to adjourn these dates were received and granted.

On January 25, 1991 the judgment against the firm of Pavelic & LeFlore was vacated. On June 21, 1991 the administratrix of the estate of Calloway by letter of counsel stated that the estate would not retain counsel in connection with any hearing which was finally scheduled for July 29, 1991.

On July 29 briefs and affidavits were received and over the defendants' objection testimony was taken from LeFlore and Dr. Calvin Butts, who had treated Calloway before and during the period of the underlying action.

*The Facts*

None of the facts relating to Rule 11 sanctions were altered by the testimony offered by LeFlore to the effect that another lawyer had prepared Calloway for his trial testimony, which had been evaluated by both the trial and appellate courts. In addition, LeFlore testified that Calloway had understood the allegations which he had made in connection with his oath that he had not signed the documents which he claimed were forgeries.

Dr. Butts called as a witness by LeFlore testified that during the period in question Calloway exhibited excellent recollection and understanding, except when his judgment was impaired by his psychiatric condition but that during this period his condition was controlled by the treatment prescribed.

No documents were offered in connection with this testimony which in LeFlore's case was obviously self-serving and unopposed. The testimony offered no basis for a finding as to the relative responsibility as between LeFlore and Calloway for the statements made in Calloway's affidavit of April 24, 1984 which gave rise to the sanctions at issue.

LeFlore offered no evidence with respect to his financial condition other than that previously submitted to the Court of Appeals in connection with his stay application.

*The Liability For Sanctions Is Joint And Several*

It was Calloway's affidavit, sworn to April 2, 1984, that was instrumental in defeating defendants' motion for summary judgment. In paragraph 7 of that affidavit, he swore under oath that he neither signed nor approved the June 8, 1981 agreements upon which Marvel and the defendants relied, which he said "were forged and contrived to deceive." The April 2, 1984 memorandum of law, signed by LeFlore, submitted in opposition to defendants' motion for summary judgment, referred to Calloway's affidavit and said on page 6 that:

the only basis on which defendants could hope to obtain summary judgment in their favor is their claim that plaintiff signed or approved the agreements on which they purport to reply.

Plaintiff's affidavit, sworn to April 2, 1984, unequivocally attests that he neither signed nor approved the agreements on which defendants purport to rely.

\*   \*   \*   \*   \*   \*

There could be no clearer statement that defendants have nothing authentic on which to rely.

The Second Circuit concurred with this court's analysis:

It appears, therefore, that but for the facsimile claim, the case would have been over. Because of that claim, the action continued as to eight defendants. On appeal, LeFlore disputes the conclusion that the facsimile claim was crucial by arguing that Judge Sweet denied the Marvel defendants' motion for summary judgment because of a claim of post-signature alterations in the text, the white-out claim, rather than the facsimile claim. However, the facsimile claim was the only alteration claim that had been made at the time of the summary judgment motion. The white-out claim was not made until two years later. The facsimile claim alone was thus the basis for Judge Sweet's decision to deny summary judgment, as his later imposition of sanctions expressly stated.

*See* 854 F.2d at 1463.

Although Calloway's April 2, 1984 affidavit was undoubtedly prepared by LeFlore, who was then representing Calloway as a single practitioner, nevertheless, Calloway did sign it under oath. Calloway's sworn denials were not, however, limited to that affidavit. He also testified under oath at numerous depositions (which were attended by LeFlore) and repeatedly swore that his signature was not on the various June 8, 1981 agreements.

At his deposition on November 6, 1984, Calloway swore under oath, with respect to his signature on Exhibit 2 at that deposition (the "Option Agreement"), "That signature I can state with absolute certainty is not mine." At the same deposition, he

swore under oath with respect to his signature on Exhibit 3 at that deposition (the "Music Agreement"), "I can state with certainty that it is not mine." Similarly, with respect to Exhibit 4 at that deposition (the "Writers Agreement"), he testified, "With certainty, I can tell you that that is not my signature." Calloway went on to testify at that same deposition that he read the original complaint and its exhibits before the complaint was served. When asked if he informed anyone that the exhibits did not contain his genuine signature, LeFlore instructed Calloway not to answer, on the basis of the attorney-client privilege.

Two days later, on November 8, 1984, Calloway testified unequivocally that he "knew," before the original complaint was filed that the June 8, 1981 agreements—the tie-in or option agreement, the music agreement, the writers agreement and the shareholders' agreement—which were annexed to the complaint did not contain his genuine signature. Once again LeFlore, invoking the attorney-client privilege, refused to let Calloway answer whether he told anyone about these "forged" agreements. Indeed, at pages 184–85 Calloway testified that he did not tell anyone other than his attorney, about the "forged" documents.

Calloway further testified at his deposition on November 8, 1984 that he had read the amended complaint before it was served and that he believed the allegations therein, which contained the accusations of forgery, to be true.

Notably, at Calloway's deposition on November 13, 1984, LeFlore stated:

The witness has testified clearly and concisely as to what signatures do not appear to be his signature and which do.

In a conference before this court on December 5, 1984, the following colloquy took place between the court and LeFlore:

THE COURT: So your position is that the signature on the document is a fake?

LeFlore: Yes.

THE COURT: And it was put on by somebody else in some device, as, obviously, in your view, by definition, unknown. He can say, "Yes, this appears to be my signature, but I didn't sign that document. Somebody must have jimmied the document."

LeFLORE: Yes.

(Ex. 1, p. 889).

Calloway further testified at his deposition on February 13, 1985 that he was absolutely certain that he did sign agreements dated June 8, 1981 to which Netta Productions was a party.

At his deposition on April 12, 1985, Calloway incongruously admitted that he did sign the option agreement. Similarly, he admitted that he signed other June 8, 1984 agreements. Having abandoned the spurious forgery or "facsimile" claim shortly before the trial, Calloway was forced to admit at the trial that he had signed all of the June 8, 1981 agreements.

Some excerpts from Calloway's deposition were read into the record at the trial in April and May of 1986, which included the following sworn statement from Calloway's deposition of November 6, 1984, referring to the Option Agreement of June 8, 1981:

That signature I can state with absolute certainty is not mine.

■ Calloway thus admitted on various occasions under oath that he read the original complaint, and its exhibits (which included the June 8, 1981 agreements), before it was served; that he read the amended complaint before it was served; and that he told no one other than his attorney, LeFlore, that the June 8, 1981 agreements were allegedly forged. Calloway also swore under oath in his affidavit in April 1984 and at his depositions in November 1984 and February 1985 that his signature had been forged on the June 8, 1981 agreements. Yet during his depositions and at the trial in April and May 1986, Calloway also admitted, from time to time, that his genuine signature did appear on those agreements. These inconsistent assertions under oath, following his unequivocal affidavit of April 2, 1984 which was instrumental both in defeating defendants' motion for summary judgment, and in prolonging this case for another two years, culminating in a six-week trial, provide more than adequate justification for imposing sanctions

of $100,000 (approximately 10% of the defendants' attorneys fees through trial) as against Calloway, now the estate of Calloway.

As to the issue of whether Calloway's conduct, for Rule 11 purposes, should be evaluated by an "objectively reasonable" test, or by a subjective standard, the Second Circuit stated:

> In imposing sanctions, Judge Sweet appears to have applied an "objectively reasonable" test to Calloway's conduct. That test, however, is appropriate only in evaluating the conduct of attorneys under Rule 11, not the conduct of parties represented by attorneys.
>
>    \*     \*     \*     \*     \*     \*
>
> We believe that a party represented by an attorney should not be sanctioned for papers signed by the attorney unless the party had actual knowledge that filing the paper constituted wrongful conduct, *e.g.*, the paper made false statements or was filed for an improper purpose.

854 F.2d at 1474.

The application of an objective standard of reasonableness in evaluating both a party's conduct and an attorney's conduct for purposes of Rule 11, has recently been stated by the Supreme Court decision in *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, —— U.S. ——, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991). The Supreme Court in addressing the issue held:

> In sum, we hold today that Rule 11 imposes an objective standard of reasonable inquiry on represented parties who sign papers or pleadings.

111 S.Ct. at 934–35. Since this court has already determined that Calloway's conduct violated the objective standard of reasonableness under Rule 11, that finding need not now be disturbed on this record.

The sanctions previously imposed under Rule 11 are justified because Calloway signed numerous papers in violation of Rule 11—the principal one being his April 2, 1984 affidavit, but also his interrogatory answers, his responses to document requests, and his various deposition transcripts. As a party signatory to these various papers signed in violation of Rule 11, Calloway is subject to the sanctions of Rule 11.

Even if Calloway had not been a signatory of offending papers in violation of Rule 11, sanctions would properly be imposed upon him by virtue of the last sentence in Rule 11, which provides:

> If a pleading, motion, or other paper is signed in violation of this rule, the court, ·upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion or other paper, including a reasonable attorney's fee.

Calloway is thus properly subject to Rule 11 sanctions both because he was a represented party, and because he himself signed papers that violated Rule 11.

### LeFlore's Responsibility

The fact that Calloway bears responsibility under Rule 11 in no way diminishes LeFlore's greater responsibility for his actions as Calloway's attorney in this litigation. In no uncertain terms, the Second Circuit expressed its view that the lion's share of responsibility fell on LeFlore's shoulders. The following excerpts from the Second Circuit's opinion make this abundantly clear:

> LeFlore did not retain a handwriting or document expert until November 1984, more than one year after he signed the amended complaint and more than six months after writing the affidavit for Calloway stating that the signatures on the agreements were not genuine and filing other papers saying the contracts were "forged" and "signed by others." This expert, Pearl Tytell, compared the original set of documents with several checks bearing five of Calloway's genuine signatures. On the basis of this examination, she told LeFlore that all the agreements were "probably" signed by the same person and "possibly" by the signer of the checks. At trial, she testi-

fied that she never considered the signatures on the June 8 agreements to be facsimile signatures, nor did she know of any evidence that they were not genuine. Calloway's deposition was taken after Tytell had made an oral report to LeFlore. When Calloway stated in that deposition that he was relying upon an expert's opinion to support the facsimile claim, LeFlore knew that no such opinion existed and that the expert actually refuted the claim. Nevertheless, LeFlore declined to drop the claim.

Finally, we note that Calloway's testimony regarding the facsimile claim was inconsistent and sometimes unintelligible and that he may have been mentally ill. These facts hardly justify pursuit of the facsimile claim, however, A reasonable attorney would not pursue a claim of forgery based on such equivocal evidence from such an untrustworthy source. A sensitivity to an attorney's obligation not to press baseless claims would call for caution in such circumstances rather than the headlong and heedless pursuit of a claim of the most serious misconduct by another attorney.

*Id.* at 1472.

\* \* \* \* \* \*

LeFlore sought a stay pending appeal of the judgment awarding sanctions. In support of his motion, he submitted an affidavit that, astonishingly enough, asserted that the facsimile claim had never been made.

As articulated by the Second Circuit, and as evident from the record in this case, LeFlore's responsibility for pursuing a baseless claim in violation of Rule 11 was abundantly clear based upon papers signed by LeFlore in violation of Rule 11, including the amended complaint; the memorandum of law of April 2, 1984 in opposition to defendants' motion for summary judgment; a reply memorandum dated May 3, 1984; responses to interrogatories dated April 22, 1985; other responses to interrogatories dated June 3, 1985; and an undated pretrial order served on March 25, 1986—all signed by LeFlore, and all reiterating the baseless claim of forgery of the June 8, 1981 agreements.

The Second Circuit gave the following instructions with respect to the relative culpability of the attorney and his client under Rule 11:

In the case of represented clients, the attorney has the principal responsibility for complying with Rule 11 and, where not misled by the client, may properly be jointly and severally liable for the judgment against the client. So long as the attorney was not misled by the client, the attorney's conduct is a proximate cause of the Rule 11 violation. How sanctions are to be structured, however, is largely a matter of the district court's discretion. We merely stress that it has power to impose joint and several liability on that portion of sanctions resulting from a party's misconduct where the attorney should have known that the misconduct violated Rule 11.

*Id.* at 1477.

\* \* \* \* \* \*

We also remand the issue of the attorneys' joint and several liability for amounts owed by Calloway, if any, after remand. We do so because Judge Sweet gave no reason for entering entirely separate judgments and may have believed that such judgments were required by the district court's decision in *Eastway [Construction Corp. v. New York*, 637 F.Supp. 558 (E.D.N.Y.1986)]. The district court stated there that clients may not reimburse lawyers for Rule 11 sanctions because the possibility of such reimbursement might eliminate the deterrent effect of Rule 11 on attorneys. 637 F.Supp. at 570. Here, however, we face a different situation, for the question whether Calloway may pay the judgment against LeFlore and the firm is not before us. Whether LeFlore and the firm should be jointly and severally liable for sanctions imposed on Calloway, in addition to the separate judgment against them, however, does fairly arise from Calloway's appeal. We believe district courts have discretion to make attorneys jointly and severally liable for sanctions

against their clients where the attorneys should have known the conduct at issue violated rule 11.

*Id.* at 1477.

As this court stated in its August 1, 1986 opinion:

> However, in the present case, the basis for Calloway's forgery and facsimile claim should have been known at the time it was originally asserted. It is apparent now that Calloway himself had no basis to make that claim, since he admitted at trial that the evidence regarding this issue was developed by his attorney and not from his personal knowledge of his signature or his actions. Calloway further stated that he was unable to determine for sure whether his signatures were authentic. On the other hand, counsel for Calloway had not yet consulted any expert at the time of the summary judgment motion, and even when an expert was obtained, no material evidence of forgery or facsimile was discovered.
>
> Given the admitted absence of any affirmative evidence from either the signatory on the documents that Calloway's signature was not genuine, it is inconceivable that this allegation could have been made in accordance with the obligations imposed by Rule 11. Instead it appears that in their ambition to maintain this action, Calloway and counsel allowed his inconclusive inability to recognize his signature to be translated into a conclusive denial of his signature. When the central basis for opposing summary judgment is proffered on such an insignificant foundation, Rule 11 sanctions are appropriate.

111 F.R.D. at 647.

In the face of post-trial motions from all of the defendants seeking sanctions under Rule 11, LeFlore submitted no affidavit from either himself or Calloway before his death attempting to justify or explain their four and one-half years of behavior. In essence, he proffered but one argument: that this court, in denying the motion for summary judgment in 1984, and in permitting this case to go to the jury in May of 1986, had effectively immunized him from the obligations and sanctions of Rule 11. As this court and the Second Circuit agreed, that argument was meritless.

While Calloway's history of mental illness might provide some explanation as to the why of his conduct in this lawsuit, as this court stated in its 1986 opinion, after alluding to Calloway's prior mental illness:

> All these circumstances placed upon Calloway's counsel a heavy burden to investigate the foundation and details of Calloway's claims.

111 F.R.D. at 645. LeFlore did not attempt to meet this burden. He and Calloway must account for their flagrant violations of Rule 11:

> ... [I]t is apparent from the record that Calloway, by his sworn statements, and counsel by his failure to investigate the basis for those statements, each contributed to the violation of Rule 11.

111 F.R.D. at 651.

The circumstances surrounding the execution of the affidavit in opposition to the summary judgment motion and the relative responsibilities of LeFlore and Calloway were considered in the August 1, 1986 opinion and have not been altered by the July 29 hearing. Since Calloway's death has precluded a meaningful development of this record, the conclusions reached there set forth below remain unaltered.

> Calloway stated at trial that the evidence regarding this issue was developed by his attorney and not from his personal knowledge of his signature or his actions and Calloway stated that he was unable to determine for sure whether his signatures were authentic. LeFlore had not consulted any expert at the time of the summary judgment motion, and when an expert was obtained, no material evidence of forgery or facsimile was discovered.
>
> In fact, Calloway's unusual demeanor as a witness at trial suggests that he may have been unaware of the consequences of his statements. On numerous occasions during his trial testimony, Calloway willingly testified in a manner directly contradictory to his prior deposition testimony.

When confronted with these inconsistencies, Calloway simply replied that he had no explanation. While one might infer that Calloway's inability to give consistent and forthright testimony resulted from his willingness to follow his attorney's advice rather than his own intent to misrepresent the facts, the evidence to support such an inference is insufficient. In addition, one must give some consideration to the medical history of Calloway which creates some uncertainty about his capability as a witness. Thus, I conclude that bad faith on the part of Calloway has not been established.

However, I also conclude that the sanctions should be borne jointly and severally by Calloway's estate and his counsel. It is, of course, difficult to allocate responsibility for the frivolous assertions made by Calloway and on his behalf by counsel, especially where the plaintiff has a history of mental illness which may have contributed to his lack of restraint in this action. To the extent that Calloway's acknowledged mental illness is a factor, it militates toward imposing joint liability upon LeFlore who was aware of Calloway's condition by the time of the litigation and certainly should have been aware of it prior to that time. However, Calloway, by his sworn statements, and counsel by his failure to investigate the basis for those statements, each contributed to the violation of Rule 11. Each person failed to uphold his responsibility to set forth accurate facts in opposition to the defendants' motion for summary judgment.

For the sake of completeness, testimony was taken on behalf of LeFlore which quite properly under the terms of the remand set forth could well have been disregarded. Indeed, the conflict between LeFlore and his now deceased client has now been spread even more fulsomely on the record. Even were the testimony to be considered admissible, the mandate notwithstanding, the prior factual findings were in no way altered by credible evidence. Both LeFlore and Calloway remain responsible for the misstatements.

Under all the circumstances, in spite of LeFlore's obvious self-interest, I decline the opportunity to scrutinize his conduct on the remand further in terms of its propriety under Rule 11. That being so, the amount of the sanctions will remain as determined in August 1986.

*Conclusion*

For the reasons set forth above upon remand the liability for the $100,000 sanction imposed upon the estate of Calloway will be reinstated. LeFlore will be jointly and severally liable with the estate of Calloway for that amount of $100,000.

Settle judgment on notice.

It is so ordered.