United States Court of Appeals,

Fifth Circuit.

No. 91-7022.

Linda GUEST, Plaintiff-Appellant,

v.

PHILLIPS PETROLEUM COMPANY and Phillips 66 Company, Defendants-Appellees.

Jan. 18, 1993.

Appeal from the United States District Court for the Northern District of Texas.

Before BROWN, GARWOOD, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

## I. FACTS AND PROCEDURAL HISTORY

In 1986, defendants Phillips Petroleum Company and Phillips 66 Co mpany (collectively Phillips) sought to expand their refinery. To do so, it was necessary that homeowners living on leased land around the refinery move. To accommodate those who were moving, Phillips developed a residential subdivision, known as the Golf Course Addition, near Borger, Texas. Phillips offered to sell lots in this subdivision to the relocating homeowners at prices below fair market value. Plaintiff Linda Guest (Guest) was among those who bought a lot in and moved her house to the Golf Course Addition. In 1988, when a large hole appeared under one of the houses, residents of the Golf Course Addition discovered that their subdivision was located on top of several abandoned well sites.

These wells had been drilled and abandoned in the 1920's under rules and regulations which would not satisfy the current rules and regulations regarding the plugging of abandoned wells established by the Texas Railroad Commission; and there was therefore considerable uncertainty as to the method used, if any, to plug these wells prior to abandonment. Guest's house was one of those located on top of an abandoned well. At the time of trial, however, the well had not caved in and the presence of the well had not caused any structural damage to the house.

Guest sued Phillips under the Texas Deceptive Trade Practices Act, Tex.Bus. & Comm.Code Ann. § 17.46 (the Act) in the United States District Court for the Northern District of Texas (USDC)

alleging that it had misrepresented the quality of the lot, engaged in an unconscionable course of conduct, and furnished a residential lot that was not suitable for human habitation. A jury found that Phillips had violated the Act by those practices. As for damages, the jury found that the reduction in the fair market value of the house caused by the presence of the well was $44,250. The jury also found that the reasonable and necessary cost of moving and reestablishing the house on a comparable lot was $83,000. After the jury returned its verdict, Guest filed a motion asking that judgment be entered on the $83,000 damage figure. She also asked for prejudgment interest on $83,000, compounded daily. Phillips opposed the motion, contending that the appropriate measure of damages under the Act was $44,250. Phillips also contended that the prejudgment interest should be compounded annually, rather than daily. The district court agreed with Phillips and entered judgment for actual damages in the amount of $44,250, and prejudgment interest on $44,250, compounded annually. Guest appeals.

## II. DISCUSSION

### 1. DAMAGES

A. *Damages Recoverable Under the Act*

In this diversity case, we are Erie-bound to follow Texas substantive law. Guest contends that the jury returned two legally acceptable measures of damages: (1) the $44,250 amount for the reduction in the fair market value of the house, and (2) the $83,000 amount for moving and reestablishing the house. Under the Act, a plaintiff is allowed to elect the higher damage amount if the "jury verdict contains more than one acceptable measure of damages." *Kish v. Van Note,* 692 S.W.2d 463, 466 (Tex.1985). Therefore, Guest contends that the USDC erred by not allowing her to choose the higher amount of damages—those based on moving and reestablishing the house.

Phillips disagrees with Guest and contends that under the Act the only two acceptable measures of damages are "out-of-pocket" and "benefit of the bargain." Because the damage amount for moving and reestablishing the house is neither "out of pocket" nor "benefit of the bargain," Phillips contends that the USDC was correct in refusing to award damages based on that higher amount.

A recent Texas Supreme Court case directly refutes Phillips' contention. In *Henry S. Miller,*

*Inc., v. Bynum,* 836 S.W.2d 160 (Tex.1992), Bynum, the owner of a hair salon, leased shopping center space from a leasing agent. The leased space was not as represented by the agent, so Bynum sued under the Act. After a bench trial, the court found that the leasing agent violated the Act and rendered judgment in favor of Bynum for $60,426 in actual damages and $120,852 in additional damages. The additional damages were awarded because the leasing agent knowingly violated the Act.[1] *Henry S. Miller Co., v. Bynum,* 797 S.W.2d 51, 53 (Tex.App.—Houston [1st Dist.] 1990, *affirmed* 836 S.W.2d 160 (Tex.1992). The actual damage award represented the lost capital investment of Bynum. On appeal, the leasing agent contended that "out of pocket" and "benefit of the bargain" were the only two measures of damages available under the Act. Because the damage award for lost capital investment was based on neither an "out of pocket" nor a "benefit of the bargain" measure of damages, the leasing agent contended that the court erred in awarding such damages. The court disagreed, holding that the Act allows recovery for actual damages, which is the total loss sustained by the consumer as a result of the deceptive act. The court said "[a]ctual damages include related and reasonably necessary expenses. Therefore such direct measures as "benefit-of-the-bargain' and "out-of-pocket' are not exclusive." (citations omitted).

B. *Economic Waste*

Having determined that the Act allows for the recovery of damages based on measures other than "out of pocket" and "benefit of the bargain," this court must still determine whether the cost of moving and reestablishing the house is an acceptable measure of damages under the Act. We hold that it is not, because the amount awarded for moving and reestablishing the house results in economic waste.

Question number 11, element A, of the jury charge inquired as to the "[r]eduction of the fair market value of Linda Guest 's home caused by the presence of an abandoned and or improperly plugged well." The jury answered $44,250.

Question number 12, element A, inquired as to "[t]he reasonable and necessary cost of moving

---

[1]Under the Act, "[i]f the trier of fact finds that the conduct of the defendant was committed knowingly, the trier of fact may award not more than three times the amount of actual damages in excess of $1,000...." Texas Bus. & Comm.Code Ann. § 17.50(b)(1).

Linda Guest's home and reestablishing it to its current condition and landscaping on another lot or lots. Such cost includes the cost of buying another comparable lot or lots." The jury answered $83,000.[2]

Damages for the cost to repair are an acceptable measure of damages under the Act. *Jim Walter Homes, Inc., v. Valencia,* 679 S.W.2d 29 (Tex.App.—Corpus Christi 1984), *affirmed as modified,* 690 S.W.2d 239 (Tex.1985); *March v. Thiery,* 729 S.W.2d 889, 895 (Tex.App.—Corpus Christi 1987, no writ). Guest contends that question number 12, element A, inquiring as to the cost of moving and reestablishing the house, is analogous to an inquiry as to the cost of repairing the house. Therefore, Guest contends that the USDC erred in refusing to allow her to elect the higher damage amount based on moving and reestablishing the house.

While several Texas courts have awarded damages for the cost of repair, those same Texas courts have limited the recovery of damages for the cost of repair to situations in which the cost of repair does not result in economic waste. In *Jim Walter Homes, Inc., v. Valencia,* 679 S.W.2d 29 (Tex.App.—Corpus Christi 1984), *affirmed as modified,* 690 S.W.2d 239 (Tex.1985), a home buyer sued his contractor for misrepresentations the contractor made concerning the quality of a defectively constructed house. At trial, the jury found that the contractor violated the Act and awarded actual damages in the amount of $12,682 for the costs of repairing the house. On appeal, the contractor contended that the trial court erred in not allowing it to present evidence as to the reduction in the fair market value of the house. The court rejected that contention, and held that the cost of repair was the proper measure of damages. The court said:

> the usual consideration in deciding which measure of damages to use is the economic feasibility of correcting the defects or bringing the house in compliance with the contract. Where the correction of defects and deviations would impair the entire structure or require the expenditure of sums in excess of the value of the structure, the correct measure of damages is the difference in the value of the structure as constructed and its value had it been constructed without defects or deviations.... We hold that the cost of repairs was the proper measure of recovery for the DTPA violation. The record reflects that the correction of the defects would not result in unreasonable ECONOMIC WASTE, and that these corrections

---

[2]Question number 12, element B, inquired into "[t]he reasonable amount of money spent in establishing and improving Linda Guest's home in the Golf Course Addition." The jury answered none. The jury's answer is clearly wrong, but Guest neither objected to nor has she appealed that answer.

were feasible without necessarily incurring unreasonable expense. *Id.* 679 S.W.2d at 38 (emphasis added) (citations omitted).

Several other Texas courts have held that it is improper to award damages under the Act for the cost of repair, if the award of those damages results in economic waste. *March v. Thiery,* 729 S.W.2d 889, 895 (Tex.App.—Corpus Christi 1987, no writ) ("Another measure of damages which has been approved for DTPA claims is the remedial measure. The damages are based upon the cost of repairs, if repairs are feasible and do not involve economic waste."); *Miller v. Dickenson,* 677 S.W.2d 253, 258 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.) ("The economic feasibility of correcting the defects of the house is the usual consideration in deciding which measure of damages to apply."); *Jim Walter Homes, Inc., v. Mora,* 622 S.W.2d 878, 883 (Tex.App.—Corpus Christi 1981, no writ) ("In construction contract cases, where the contractor breaches because of defective construction, Texas courts allow damages based on cost of repair, if repair is feasible and does not involve unreasonable economic waste. Where the correction of defects would require that the structure, in whole or in material part, be changed, or the expense of such repair would be great, the correct measure of damages is the difference in the value of the structure as constructed and its value had it been constructed without defects."); *Greene v. Bearden Enter., Inc.,* 598 S.W.2d 649, 653 (Tex.Civ.App.—Fort Worth, 1980, writ ref'd. n.r.e.) ("Where the correction of defects and deviations would impair the entire structure or require the expenditure of sums in excess of the value of the structure, the correct measure of damages is the difference in the value of the structure as constructed and its value had it been constructed without defects or deviations.").

Texas rule against awarding damages that result in economic waste compels this court to hold that the damages awarded for moving and reestablishing the house are not "an acceptable measure of damages." *See Kish v. Van Note,* 692 S.W.2d at 466. In the present case, it simply was not possible to repair the house. The cost of moving and reestablishing the house, however, is analogous to the cost of repairing a structural defect that exceeds the value of a house in an undamaged condition. According to the jury's answers, the cost of moving and reestablishing the house was

$83,000,[3] whereas the fair market value of the house without the well located beneath it was $45,000.[4] If Guest was allowed to recover on the higher damage amount, Phillips would be required to pay for Guest to move and reestablish the house when those costs far exceed the value of the house without a well located beneath it. A rational homeowner would not make such a decision. It does not make economic sense for *anyone* to pay $83,000 to move a given house from undesirable Y subdivision to desirable X subdivision when you can buy just as good a house in X for $45,000. In sum, Texas law does not allow a plaintiff to recover damages that result in economic waste, and therefore we hold that the USDC was correct in refusing to allow Guest to elect to recover damages based on the $83,000 figure.

The dissent by our distinguished colleague makes much of the fact that the cases we rely on in reaching our decision involve a defect in the house itself rather than a defect in the land upon which the house is built. While we realize that there is such a distinction, we believe that it is not a meaningful one; and that, absent any support in Texas case law to the contrary, the facts in the instant case are sufficiently analogous to those Texas cases denying relief for cost of repair when such costs exceed the value of the house or result in economic waste to support our conclusion. We also believe that the dissent's concern with whether Guest will be able to find a purchaser are not relevant. The jury implicitly found that Guest's house with a well located beneath it had a fair market value of $750;[5] thus finding that $750 was the amount of money that a willing purchaser would pay and a

---

[3]The estimate to move and reestablish the house was $77,019.02, which consisted of $3,775 for stripping the brick, $1,820 for preparing the house for moving, $5,392.80 for concrete, $692 for steel and wire, $527.30 for wood materials, $10,480.60 for labor, $527 for ditch work, $400 for tool rental, $5,460.70 for carpenter work, $2,100 for ceramic tile work, $885 for electrical work, $5,865 for plumbing work, $7,354 for painting work, $9,580 for brick work, $13,630 for moving the house, $4,187.20 for subcontractor supervision, $275 for floor covering work, $4,200 for removing concrete, and $166.92 for cooling unit removal and installation. The expert for Guest estimated that a comparable lot would cost between $5,000 and $6,000.

[4]The expert for Phillips estimated that the fair market value of the house without the well located beneath it was $45,000, and the expert for Guest estimated that the fair market value was $50,000. Guest concedes on appeal, and the jury found at trial that "[t]he fair market value of Linda Guest's home" without a well located beneath it was $45,000.

[5]The jury found that the house had a fair market value of $45,000 without a well and that the presence of the well reduced the fair market value of the house by $44,250; thus impliedly finding that the house had a fair market value of $750 with the well located beneath it.

willing seller would accept for the house with a well located beneath it.[6] The dissent would have us venture behind the jury's findings to speculate whether Guest will in actuality be able to sell the house for $750 based on Phillip's lack of success in selling other homes in the Addition after the discovery of the abandoned well sites. We believe, however, that on appeal we must assume that the jury took those factors, which were fully developed and explored by Guest's counsel, into consideration in reaching its decision. Finally, we believe that the dissent's assertion that any amount awarded less than $83,000 will do great injustice and would violate the purposes of the Act is legally and factually insupportable. We do not see how awarding Guest $83,000 for a house that a willing purchaser would pay a willing seller $45,000 for in a free market, if the house did *not* have a well located beneath it, furthers justice or the purposes of the Act. What the dissent's proposed disposition of this case would do is award Guest a large windfall in excess of the value of her house without a well beneath it for Phillip's actions in unknowingly selling her a defective lot.[7]

## 2. PREJUDGMENT INTEREST

The USDC awarded Guest prejudgment interest on $44,250 at the rate of 10 percent per annum, compounded annually. Guest contends that the USDC erred in compounding the interest annually rather than daily.

In *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985), the Texas Supreme Court held that "prejudgment interest shall accrue at the prevailing rate that exists on the date judgment is rendered according to the provisions of Tex.Rev.Civ.Stat.Ann. art. 5069-1.05 § 2." In 1987, the Texas Legislature amended Section 2 to require that interest be compounded annually. The historical and statutory notes to the 1987 amendment provide that the "Act applies only to: (1) an action commenced on or after the effective date of this Act." Tex.Rev.Civ.Stat.Ann. art. 5069-1.05 § 2 (Historical and Statutory Notes). The effective date of the Act is September 1, 1987. *Id.* Guest

---

[6]The USDC instructed the jury that fair market value "means the amount of money that a willing purchaser, who desires but does not have to buy, would pay in cash for Linda Guest's home, and that a willing seller who desires to sell but who is not compelled to sell, would accept for the home."

[7]The jury did not find that Phillips knowingly violated the Act.

did not sue Phillips until 1989. Moreover, Texas courts have held that Section 2 now requires prejudgment interest to be compounded annually. *Enterprise-Laredo Assoc. v. Hachar's Inc.,* 839 S.W.2d 822 (Tex.App.—San Antonio 1992, no writ); *See also Winograd v. Willis,* 789 S.W.2d 307, 312 (Tex.App.—Houston [14th Dist.] 1990, writ denied); *OKC Corp. v. UPG Inc.,* 798 S.W.2d 300, 307 (Tex.App.—Dallas 1990, writ denied).

To support her contention that the prejudgment interest should be compounded daily, Guest relies on the case of *Law Offices of Moore & Assoc. v. Aetna Ins. Co.,* 902 F.2d 418 (5th Cir.1990). In that case, this court upheld a lower court judgment that compounded daily prejudgment interest on a suit filed after September 1, 1987 [the effective date of the amendment]. From reading the opinion, however, it is clear that the defendant in that case did not raise the issue of whether the interest should be compounded daily or annually, and that the court's statement that the interest should be compounded daily was dicta. In any regard, we are bound to follow the Texas courts' interpretations of Texas law. Therefore, we reject Guest's contention, and hold that the USDC was correct to compound the prejudgment interest annually.

For the foregoing reasons the judgment of the district court is AFFIRMED.


JOHN R. BROWN, Circuit Judge, concurring in part, dissenting in part.

When Phillips Petroleum Company decided to expand their refinery operations, they were forced to relocate many homeowners who lived on leased land surrounding their refinery. Phillips developed a residential subdivision called the Golf Course Addition, and sold plots of land in that subdivision to the people who were displaced by their refinery expansion. Linda Guest was one of the homeowners who was forced to move. Along with many other homeowners, Guest purchased land in the Phillips subdivision and moved her house there. After living in the subdivision for only a short time, a large hole appeared beneath one of the homes in the neighborhood causing damage to the home. Residents of the Golf Course Addition soon discovered that their entire neighborhood was located on top of an abandoned well site. Guest subsequently discovered that her house was positioned directly on top of one of the abandoned, unplugged wells. Guest sued Phillips pursuant

to the Texas Deceptive Trade Practices Act (DTPA) for the damages she sustained as a result of the placement of her home on an abandoned well. Tex.Bus. & Com.Code Ann. §§ 17.41 *et seq.* (Vernon 1987). Guest claimed actual damages of $83,000, which comprised the total cost of removing her house from Phillips' abandoned unplugged well site and establishing it at another location.

On appeal the court holds that Guest is not entitled to the $83,000, because such a recovery would constitute economic waste. Therefore, the court affirms the award to Guest of $44,250 for the fair market value of the house. I respectfully dissent from this part of the court's opinion.

The court suggests that economic waste will result if Guest is awarded damages equal to the cost of relocating the house because the cost of relocation exceeds the current fair market value of the house. The court then cites a number of cases for the proposition that Texas courts may not award damages for the cost of repair if the cost of repair results in economic waste. *March v. Thiery,* 729 S.W.2d 889, 895 (Tex.App.—Corpus Christi 1987, no writ); *Miller v. Dickenson,* 677 S.W.2d 253, 258 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.); *Jim Walter Homes, Inc. v. Mora,* 622 S.W.2d 878, 883 (Tex.App.—Corpus Christi 1981, no writ); *Greene v. Bearden Enter.,* 598 S.W.2d 649, 653 (Tex.App.—Fort Worth 1980, writ ref'd n.r.e.). The court then concludes, based on these cases, that the cost of moving and reestablishing the Guest house will result in economic waste.

This court's argument with regard to economic waste is highly suspect for the following reason: the case at hand does not involve a defect in the construction of the house, as do the cases cited by the court; rather, the case at hand involves a fundamental defect in the land upon which the house is built. The jury found that Guest's house, built on this defective land, was uninhabitable. Trial Record, p. 1944. Allowing this house to remain in its current uninhabitable and unusable condition is economic waste in the worst sense. Guest's house, otherwise habitable but for its location, if not moved, may have to be abandoned—what could possibly be greater economic waste than that? The cases cited by the court simply do not hold that economic waste will result if a house that is built on property that is fundamentally flawed is relocated to another location to make the house habitable. In addition, forcing Guest to either sell the house for a substantial loss, abandon the house, or move the house at her own expense will result in substantial financial loss to Guest, a result

I believe to be grossly inequitable. Besides, would any reasonable purchaser buy a house whose collapse is imminent? That the record indicates that Phillips did not have success selling other homes in the Golf Course Addition after the discovery that the development had been built on an abandoned well site only confirms my feeling that the court's damage award was unjust.

The jury found that $83,000 was the reasonable and necessary cost of reestablishing Guest's house on another lot, and that amount is the proper measure of recovery.[8] Any lesser amount would do a great injustice and would violate the purpose of the DTPA. The second issue raised on appeal is whether the district court erred in compounding the interest annually instead of daily. On this issue I concur with the court.

I dissent.

---

[8]Jury question number 12, element A, addressed the "reasonable and necessary cost of moving Linda Guest's home and reestablishing it to its current condition and landscaping on another lot or lots. Such cost includes the cost of buying another comparable lot or lots." The jury answered $83,000. Appellant's Brief at 6.