**In re FRENCH BOUREKAS, INC., Debtor.**

**Bankruptcy No. 93 B 43470 (TLB).**

United States Bankruptcy Court, S.D. New York.

Dec. 13, 1994.

Gerard Zwirn, New York City, pro se and for debtor.

Zetlin & De Chiara by Raymond T. Mellon, New York City, for United Capital Corp.

Cullen & Dykman by Antonia M. Donohue, Garden City, NY, for Crossland Commercial Funding Corp. I.

## AMENDED DECISION
## ON SANCTIONS [1]

TINA L. BROZMAN, Bankruptcy Judge.

Once in a long while an attorney for the debtor in possession in a chapter 11 case, who is an officer of the court, engages in

---

1. This amended decision corrects a factual error in my original decision of November 30, 1994.

conduct which is sufficiently violative of that relationship that sanctions must be imposed so as to preserve the integrity of the bankruptcy process. This is such a case.

## I.

The sanctionable conduct arises from statements made by attorney Gerard Zwirn on the record on September 20, 1994. To understand why I am granting the request for sanctions, one must place those statements within the debtor's course of conduct as a whole. Therefore, I will lay out the background, which is undisputed, in some detail[2].

The relevant history begins in February, 1988, when the predecessor of United Capital Corporation ("UCC")[3] sold certain premises to 183 Lorraine Street Associates ("LSA"), landlord of the debtor, French Bourekas, Inc. ("Bourekas"). To secure payment of part of the purchase price, UCC's predecessor was granted a mortgage on the building. Bourekas occupies space there pursuant to a lease executed after the granting of the mortgage and which specifically subordinates Bourekas' estate to the lien of the mortgage.

UCC instituted a foreclosure action against LSA in state court in June, 1990, without naming as a defendant Bourekas, of whose existence UCC was then ignorant. UCC moved successfully for summary judgment and a referee was immediately appointed to compute the amount of the debt owing. Just prior to the filing of the motion, UCC had learned of Bourekas' tenancy, although it did not seek to add Bourekas as a party defendant prior to submitting the motion for decision.

Apparently rethinking its decision not to foreclose Bourekas' tenancy, after the summary judgment had been granted UCC sought an order seeking permission to add Bourekas as a defendant and to serve a supplemental summons and amended verified complaint of foreclosure. In January, 1992, the state court granted the motion.

As soon as the order was issued joining Bourekas as a defendant, Bourekas commenced a separate action in state court against UCC. Seeking a preliminary injunction, Bourekas contended that because UCC had already obtained a foreclosure judgment (an assertion which was erroneous, UCC having received only an order granting summary judgment), and because Bourekas had not been served with process in that action, the state court was without jurisdiction to grant UCC's application to add Bourekas as a party subsequent to judgment.

The state court took a decidedly different view of things, holding that its order was not a judgment, denying Bourekas' request for injunctive relief, and treating UCC's opposition as a cross motion for dismissal, which it granted. *French Bourekas, Inc. v. United Capital Corp., et al.,* Kings Co. Index No. 3133/92. Bourekas filed a notice of appeal and unsuccessfully sought a stay of the foreclosure action from the appellate division. After perfecting its appeal, Bourekas asked the appellate division for a preference, which request was also denied. (It should be noted that in June, 1994, the appellate division unanimously affirmed the lower court's order dismissing Bourekas' action for an injunction.)

Having met with no success in its effort to prevent the foreclosure proceeding which would terminate its tenancy, Bourekas duly answered the amended verified foreclosure complaint, asserting a variety of defenses including that foreclosure should not be permitted because of UCC's predecessor's storage of hazardous waste at the premises now occupied by Bourekas. This, claimed Bourekas, constituted illegality, unclean hands and unconscionable conduct such that foreclosure should not be granted. In addition, Bourekas asked for judgment for $200,000 repre-

---

2. I did conduct an evidentiary hearing on the disputed point, namely, whether Zwirn had any basis in making the representations which he made to me. The parties do not diverge, however, in their recitations of the underlying facts. Thus, I have laid out the facts from those contained in their papers which are undisputed; many of these are drawn from the pleadings and decisions in the state courts.

3. Whether the predecessor was a predecessor in interest or in name is not clear from the record. The distinction, however, is not relevant to this motion.

senting its costs for improvements, fixtures, repairs and other expenses and the imposition of an equitable lien in that amount. On January 20, 1993, Justice Shaw issued a decision dismissing Bourekas' defenses and counterclaims and granting summary judgment to UCC. He noted that Bourekas offered no proof that the premises had been permeated by hazardous, toxic waste and that, in any event, Bourekas could not equitably challenge the mortgage since (1) it was not in privity of estate or contract with UCC because its lease was executed after the mortgage was granted and (2) the grounds asserted by Bourekas were personal to the parties to the mortgage. Further he held that Bourekas' lease provided that fixtures installed by the tenant became property of LSA, disabling Bourekas from recovering for their loss. Justice Shaw did, however, deny UCC's motion for confirmation of the referee's report because Bourekas was not present at the hearing. Noting that Bourekas had the equity of redemption, which, of course, made it an interested party in the amount due UCC, he ordered a new hearing and a new report.

Needless to say, issuance of the order for summary judgment against Bourekas did not squelch Bourekas' efforts. Bourekas appealed and followed that action with the filing of a Chapter 11 petition in the Southern District of New York on July 6, 1993. Postpetition, but without seeking relief from the automatic stay imposed by the filing of the chapter 11 case, Bourekas perfected its appeal of the order granting summary judgment against Bourekas. That order was also affirmed by the appellate division in June, 1994.

The primary front then changed to this court. Bourekas' chapter 11 filing was admittedly an attempt to stave off foreclosure of Bourekas' lease and without the necessity of posting a bond. UCC moved to lift the automatic stay. Bourekas cross-moved to assume its lease with LSA. I granted UCC's motion to lift the stay in October, 1993, and treated Bourekas' cross-motion as an application for an extension of time to assume or reject the lease, which extension I granted so that Bourekas might reap the benefit of any

success in its then-pending appeals. My decision to grant UCC's motion to lift the stay was grounded in the fact that the lease was subordinate to the lien of the mortgage, as the state court had also found, and that UCC's equitable defenses to the mortgage had been rejected. I noted that Bourekas found itself in a sort of "Catch–22", because it could only assume the lease in its entirety, yet such assumption would carry with it the lease's provision that established it as subordinate to the mortgage's lien. Bourekas' only other alternative (unless it moved to different premises, which it wasn't willing to do) would be to pay off UCC's mortgage and the liens senior to it, state law providing a tenant could inherit the equity of redemption from the fee owner if the tenant were willing to make the mortgagee whole. However, there had been no proposal by the debtor to do that. Finally, I noted that I was baffled as to how Bourekas might reorganize, because its lease could be foreclosed upon once a plan were confirmed even had I not determined before confirmation to lift the automatic stay. Thus, as I had previously discussed in the similar case of *In re Village Rathskeller, Inc.*, 147 B.R. 665 (Bankr. S.D.N.Y.1993), any plan predicated upon the lease was doomed to failure as not being feasible because the landlord's mortgagee could wipe out the lease through foreclosure once the automatic stay were terminated.

Zwirn decided to shift his war with UCC to a third front he had previously selected. After UCC had moved for relief from stay, Zwirn had removed the foreclosure action to the bankruptcy court for the Eastern District of New York. This had bought more time, diverting the foreclosure action away from the state court justice well-acquainted with its nuances. Zwirn decided to utilize the new forum to assert again the same defenses previously rejected by the state court justice and which he had asserted in conjunction with the hearing before me on UCC's lift stay request and Bourekas' request that it be permitted to assume its lease without the burden of the subordination provision. To that end, after I lifted the stay to allow the foreclosure action to proceed, Zwirn voluntarily dismissed an adversary proceeding against UCC in this court which asserted the

same defenses only to recommence it against UCC in the bankruptcy court for the Eastern District of New York. That Eastern District adversary proceeding raised the same issues as unsuccessfully asserted in defense of the foreclosure action in state court, namely UCC's predecessor's environmental violations.

Sometime thereafter, Bourekas moved in this district under § 1121(d) of the Bankruptcy Code to extend its exclusive period to file a plan, a motion which I denied in December, 1993, for the reasons which had earlier led me to lift the automatic stay, that is, the inability to confirm a plan of reorganization coupled with a lack of equity in the property.

As I noted earlier, so as to afford Bourekas an opportunity to pursue its appeal in the foreclosure action, I had entered an order in November, 1993, that granted Bourekas an extension of 120 days to assume or reject its lease. Prior to the expiration of that extended period Bourekas moved for a further extension of time, again relying on the pendency of the two appeals. In April, 1994, I extended the time to assume or reject for another 90 days.

Bourekas sought a third extension of 180 days to assume its lease, but this time after the appeals had been determined adversely to Bourekas and Bourekas had let pass the time to further appeal. That motion was heard on September 20, 1994, and resulted in the statements by Zwirn which occasioned UCC's motion for sanctions. Bourekas' counsel urged at the hearing that I grant a further extension of time for assumption or rejection of the lease simply because the hammer had not fallen at the foreclosure sale (due, in large part, to the maneuvering through three courts which Zwirn had engineered). Not wanting to prolong Bourekas' shenanigans any longer, I indicated to counsel that I saw no basis for a further extension of time because no reorganization could occur. To ward off an order denying a further extension of time, Zwirn informed me that Bourekas was actively involved in procuring financing for the exercise of the equity of redemption. This would require that UCC be paid all sums due under the mortgage being foreclosed, a sum that exceeded $1 million dollars, plus satisfaction of the senior liens on the property (which were a multiple of the more than $1 million due UCC).

After a brief, stunned silence, I expressed serious doubts as to Bourekas' ability to exercise the equity of redemption, given that Zwirn had twice before stated on the record that it could not do so. Nevertheless, Zwirn reaffirmed his statements. I invited Zwirn to call his witness to the stand to testify in support of counsel's assertions, but he declined to do so, indicating that the person sitting next to him was a broker and could not testify as to the facts. Zwirn stated, however, that his client had provided him with the facts and that he could produce a witness if granted an adjournment. I adjourned the motion to October 5, and directed Zwirn to produce a witness to testify to these representations, making it crystal clear to counsel that I would not hesitate to impose sanctions should counsel be unable to support his statements to me. In what he now must view as a Faustian bargain, Zwirn reaffirmed his statements a third time.[4]

---

4. The actual exchange was as follows:

Mr. Zwirn: ... This is my application to extend the time to assume or reject the lease.
The Court: I've read your papers and I'm hard pressed to find any cause for an extension [of time to assume the lease].
Mr. Zwirn: Well, Your Honor, the foreclosure has not been completed. Until the hammer goes down on the auction, there's no reason why we shouldn't remain. All postpetition rents have been paid ...
The Court: Your rights to appeal are gone now. Isn't that correct?
Mr. Zwirn: That's correct, Your Honor.
The Court: So what basis is there? You have no possibility now of reorganization.

Mr. Zwirn: Because we would have a right to purchase at the foreclosure sale, we're now seeking additional financing, and until the auctioneer's hammer goes down, we'd have a right to redeem.
The Court: Redeem by buying the whole building, and you've previously told me that you have no intention or ability to do that.
Mr. Zwirn: We would have a right and possibility of acquiring the entire property.
The Court: Well—
Mr. Zwirn: We're seeking financing for it now....
The Court: ... It seems to me at this point that there's no basis that I can see for reorganization, that—

Unsurprisingly, Zwirn showed up in chambers with a motion by order to show cause, returnable on October 5, 1994, seeking a voluntary dismissal of Bourekas' petition. That motion, attached as Exhibit L to UCC's motion for sanctions, acknowledged that Bourekas had no possibility of reorganization (which it attributed to my having lifted the automatic stay rather than to the fact that its lease was subordinate to the mortgage) but was also an explicit admission that Bourekas had no ability to exercise the equity of redemption because the liens were far in excess of the value of the property, precluding refinancing. Indeed the affidavit attached to the chapter 11 petition itself admitted that there was no equity in the property. Yet on September 20 Zwirn told me that his client told him that it was actively seeking financing in order to exercise the equity of redemption. I am led to the inescapable conclusion that Zwirn was at best reckless in representing,

and at worst, intentionally misrepresented to me that Bourekas was actively seeking financing and had prospects for reorganization. As I subsequently learned, he did this in order to secure more time so that he could throw up yet another roadblock, this time by filing an involuntary bankruptcy petition against LSA, Bourekas' landlord, which of course gave rise to another automatic stay of the foreclosure action.[5]

At the October 5 hearing, I granted Bourekas' motion to dismiss its case with prejudice, since Bourekas had engaged in a clear pattern of using numerous litigations in different courts to increase UCC's costs and delay UCC's rightful foreclosure. By virtue of its own bankruptcy petition, Bourekas, whose prospects for reorganization at the time it filed its case can at best be charitably described as slim, had succeeded in delaying UCC for over 15 months in foreclosing on its

Mr. Zwirn: Well, the foreclosure is still pending.

The Court: I understand that, but I have to have cause to extend the time to assume or reject, and you've just admitted to me that your apellate [sic] rights are gone, so you are losing this lease because it's subordinate to the lien of the mortgage.

Mr. Zwirn: But the foreclosure is still existing with Judge Holland. He has not made any ruling on it. There's no judgment of foreclosure yet. That's the companion case in Brooklyn.

The Court: Yes, I know about that.

Mr. Zwirn: We think the lease should be extended until the auction hammer—

The Court: No. I don't really see why I should extend the time to assume or reject unless there's a possibility here of there being some kind of reorganization. So if you want to put your witness on the stand to testify as to the prospects for financing and reorganizing here, I'll be happy to hear the testimony.

Mr. Zwirn: I cannot do that today, but if the Court will give us a short adjournment, I will bring such a witness. I don't have one here.

The Court: Who is that sitting next to you?

Mr. Zwirn: He's a broker who is in this, but he's not a party to this proceeding.

\* \* \* \* \* \*

The Court: Well, I'll give you a brief—I frankly don't see it and I really shouldn't even do this, probably, but in an effort to err on the side of caution, and since I don't really see any harm to the landlord [sic], I will give you a brief adjournment in which in which to bring someone down here to testify to the matters that you state.

However, I'll warn you now that if the testimony is not in accord with what you have represented to me that I will consider the imposition of Rule 11 sanctions for your having put the landlord [sic] through this.

So I think you want to carefully consider whether or not you can prove to me what you've stated.

Mr. Zwirn: I was told by the client that this is a fact. I have no independent knowledge of it.

The Court: I'm willing to entertain this and grant you the adjournment based on your representation, because you're an officer of the Court, but I'm telling you now that if you put us through a second hearing and you can't bear out the statement you made to me, I will consider the imposition of sanctions.

Mr. Zwirn: If I feel I cannot do so I will so inform the court and withdraw the application.

The Court: That's fine. In the meantime, the time to assume or reject is extended through and including the conclusion of the adjourned hearing. The record is so ordered.

Transcript of September 20, 1994, pages 3 through 8.

5. After the involuntary petition was filed by Bourekas and two other creditors of LSA, somewhat curiously UCC joined in the petition. Its counsel explained that after four years of litigating with LSA and Bourekas, he felt it prudent to get involved in that case from the outset so as to best protect his client's rights. The point, however, is that the purpose of the filing by Bourekas was to regain an automatic stay to prevent the foreclosure. Whereas one can question the wisdom of UCC's reaction to the petition, one can also sympathize with its frustration at Bourekas' actions.

mortgage, during which time Bourekas never even hinted that it might file a plan of reorganization. Prior to that October 5 hearing, Bourekas did not withdraw its application to extend the time to assume or reject its lease, as Zwirn had indicated on September 20 that he would do if he could not support his statements to me. The reason for that is now clear; had he done so, Bourekas' lease would have been rejected by operation of law and he obviously feared that this would lead to a quicker lifting of the stay in the new bankruptcy case in Brooklyn.

I did not, however, entertain UCC's oral request for sanctions at that hearing. Rather, I retained jurisdiction to permit UCC to seek sanctions and to permit Zwirn to defend himself. UCC duly filed a motion seeking sanctions of Zwirn and of Bourekas and they responded.[6] At the hearing, they called only one witness, Zwirn himself. No one from Bourekas testified as to the information that had supposedly been imparted to Zwirn which, he said on September 20, warranted my adjourning the hearing. Zwirn did ask that one Joseph Fischer, whom he identified as a creditor of LSA, be permitted to testify about his discussions relative to financing. I declined to hear testimony from Fischer, however, since it was this same individual whom Zwirn refused to call to testify on September 20 about Bourekas' efforts to acquire the building, telling me that Fischer could not testify to the facts and that Zwirn needed an adjournment to obtain a competent witness. It was precisely because Fischer could not so testify that I granted the adjournment.[7]

## II.

■ UCC asks that I sanction Zwirn and Bourekas under Federal Rule of Bankruptcy Procedure 9011 on the grounds that Bourekas' petition was filed in bad faith. I cannot conclude that the petition was a wholly frivolous one, for at the time it was filed, UCC's rights had not been adjudicated on

appeal. Simply because Bourekas filed a petition instead of posting a large supersedeas bond does not mean that the filing was *per se* in bad faith. Moreover, I am mindful of this Circuit's ruling in *In re Cohoes Industrial Terminal, Inc.*, 931 F.2d 222 (2d Cir.1991), which set forth a fairly stringent standard for imposition of such sanctions on bad faith filing grounds. I actually granted Bourekas extensions of time to assume its lease until the appeals were disposed of, which certainly cuts against any finding now that the petition was filed in bad faith. In addition, UCC did not move at the inception of the case to dismiss it as a bad faith filing. It hardly seems appropriate that counsel permit a petition to remain for 15 months in this court without challenging its *bona fides*, only to move for sanctions for its filing at the time that the case is dismissed on the debtor's own motion. *See generally, In re Johns Manville Corp.*, 36 B.R. 727 (Bankr.S.D.N.Y. 1984); *In re Giggles Restaurant, Inc.*, 103 B.R. 549, 554 (Bankr.D.N.J.1989). However, the pattern of behavior in which Zwirn engaged leads me to the conclusion that sanctions under 28 U.S.C. § 1927 are appropriate.

28 U.S.C. § 1927 provides that

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

■ In *Cohoes*, 931 F.2d at 230, this Circuit held that "[a] bankruptcy court may impose sanctions pursuant to 28 U.S.C. § 1927 if it finds that '[an] attorney's actions are so completely without merit as to require the conclusion that they must have been taken for some improper purpose such as delay.'" *Id.* at 230. *See also In re Wonder*

---

6. Notwithstanding his obvious conflict of interest, Zwirn purported to represent both himself and his client.

7. Fischer sought leave to intervene in the motion for sanctions, a request which I denied after I

had ascertained that his reason for seeking such relief was to assert that any monetary sanctions awarded should be paid to LSA, rather than to UCC. There was no merit to that suggestion.

*Corp. of America,* 109 B.R. 18, 27–28 n. 11 (Bankr.D.Conn.1989); *Novelty Textile Mills v. Stern,* 136 F.R.D. 63, 76 (S.D.N.Y.1991) (magistrate judge may impose sanctions under § 1927).

Imposition of sanctions under this section requires a clear showing of bad faith. *Oliveri v. Thompson,* 803 F.2d 1265, 1273 (2d Cir.1986), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). The court must find both that an attorney's conduct was motivated by an improper purpose, such as harassment or delay, and is entirely without color. *Wonder Corp.* at 28.

Zwirn's representation that Bourekas had a possibility of acquiring the entire property and was seeking financing for it currently was incredible inasmuch as Bourekas' earlier applications had established $4 million dollars of senior debt on the property and Zwirn had acknowledged twice on the record that Bourekas had an inability to exercise the equity of redemption. Placed in the context of Zwirn's ongoing crusade of litigation designed to forestall UCC's inevitable foreclosure, Zwirn's statement was obviously interposed solely for delay. At the hearing on UCC's request for sanctions, Zwirn did not introduce one shred of testimony from Bourekas that its principals were negotiating financing. Zwirn himself testified that he had had some discussions over the months with his clients about their efforts to acquire the building, but he was extremely vague about what was said and when. In short, his testimony was neither probative nor believable, particularly in light of what Bourekas stated in the motion to dismiss. In the papers, Bourekas specifically stated that "[f]or the debtor to redeem United Capital Corp.'s

mortgage, it would require an evaluation appraisal of the market value of the premises to sustain the prior liens of $4,525,952.71 and also its ability to satisfy such liens." Debtor's Motion To Dismiss at ¶ 21.[8] Further, the debtor stated that, if its case were dismissed, that would leave the debtor "with the likelihood and possibility of settlement negotiations during the period between dismissal of this case and the actual foreclosure sale." *Id.* at ¶ 23. Note that the debtor did not say that it could come up with financing. What the debtor also did not say in this application is that it had *simultaneously* filed an involuntary bankruptcy petition against LSA, which had the effect of automatically staying the foreclosure yet again.

Sanctions are demanded. Evidence clearly demonstrates that Zwirn, by multiplying proceedings, has used this bankruptcy court as a means of delaying a secured creditor which had obtained relief from the stay from exercising its legitimate right to continue its foreclosure proceeding. The multiplication of proceedings coupled with the admission that Bourekas could not reorganize when but a few days earlier its counsel said it was negotiating financing to acquire the equity of redemption which was essential to its reorganization was why I dismissed the petition with prejudice. It is also is why I am granting sanctions under § 1927. *Cf. In re French Gardens, Ltd.,* 58 B.R. 959 (S.D.Tex. 1986) (Filing of bankruptcy petition solely to forestall a secured creditor from exercising its foreclosure rights, without any intent to complete plan of reorganization, violates § 1927). Whereas I cannot say that there was absolutely no intention to reorganize when the petition was filed, there was a proliferation of proceedings instituted there-

---

**8.** Zwirn would like to point to his statements on the record at the October 5 hearing on the motion to dismiss as evidence of the good faith of his earlier representations. At that hearing, the following exchange was had—

> The Court: I don't intend to take the testimony [on sanctions] today, but I will ask if there is a need for testimony or do you concede there was no factual basis for the statements you made on the record?
> Mr. Zwirn: There was factual basis and I have witnesses. I didn't present them because I made the application to dismiss.

Transcript of October 5, 1994 hearing at page 26.

Despite these assurances, the events that transpired at the November 15 hearing on sanctions proved otherwise. Zwirn had entered a pre-trial order identifying 9 witnesses, none of whom he brought with him, or subpoenaed for trial, other than Mr. Fischer. There was an utter failure of proof that he had any reasonable basis to have told me that a refinancing and reorganization through exercise of the equity of redemption was possible. Thus, Zwirn's October 5 statements are little more than further evidence of his willingness to represent to the court whatever is expedient.

after and an unfounded representation to the court made solely to delay the foreclosure action which I had permitted to proceed. As Zwirn explained it, Bourekas wanted the protection of this court until the auction hammer had fallen. And Zwirn was doing his best to delay that event as long as he could possibly accomplish.

■ Sanctions can also be imposed by a bankruptcy court under 11 U.S.C. § 105(a), which provides in pertinent part that a bankruptcy court

> may issue any order, process or judgment that is necessary or appropriate to carry out the provision of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate ... to prevent an abuse of process.

Further, the inherent power of this court allows for the imposition of sanctions. *Roadway Express Ltd. v. Piper,* 447 U.S. 752, 765, 100 S.Ct. 2455, 2463–64, 65 L.Ed.2d 488 (1980); *Cosmopolitan Aviation Corp. v. New York State Dep't of Transp. (In re Cosmopolitan Aviation Corp.),* 763 F.2d 507, 517 (2d Cir.1985) (where there has been willful abuse of judicial process, court may exercise its inherent power to assess attorney's fees against counsel); *Cedar Tide Corp. v. Mintz (In re Cedar Tide Corp.),* 164 B.R. 808 (E.D.N.Y.1994) (approving bankruptcy judge's decision to impose sanctions under court's inherent power.) These powers also are invoked to assess sanctions against Zwirn.

■ Were I convinced that Bourekas played any knowing part in these various postpetition strategies, I would sanction Bourekas too. However, I have observed repeatedly that Zwirn seems to confer not with his client but with Fischer. Under the circumstances, I believe that the orchestration here is the product of Zwirn, rather than of his client.

■ Accordingly, UCC's motion for sanctions against Zwirn is granted under 28 U.S.C. § 1927 and 11 U.S.C. § 105(a), and against Bourekas is denied. UCC is directed

to prepare an affidavit attesting to its excess costs, expenses, and attorneys' fees incurred in this court. Zwirn may have one week in which to respond in writing to UCC's affidavit. In addition, pursuant to § 105(a), Zwirn is directed to remit to the Clerk of the Court a sanction of $500.

SETTLE ORDER consistent with this decision.