**In re 72ND STREET REALTY ASSOCIATES, Debtor.**

**Bankruptcy No. 93 B 44927 (JLG).**

United States Bankruptcy Court, S.D. New York.

July 25, 1995.

Anderson Kill Olick & Oshinsky, P.C., New York City, pro se and as counsel to Roy Babitt and Lawrence Hartman.

Bloom Borenstein, P.C., Springfield, NJ, for WT Associates.

### MEMORANDUM DECISION ON OBJECTION TO CLAIM FOR SANCTIONS

JAMES L. GARRITY, Jr., Bankruptcy Judge.

Pursuant to a cross-motion filed in response to Anderson Kill Olick & Oshinsky's ("AKOO") motion to be relieved as counsel herein, WT Associates ("WT") seeks to sanction AKOO, Roy Babitt, Esq., ("Babitt"), an AKOO partner, and Lawrence Hartman, Esq., ("Hartman"), a former AKOO partner, pursuant to Bankruptcy Rule 9011, 28 U.S.C. § 1927, and our inherent sanction powers.[1] AKOO, Babitt and Hartman (collectively, the "Objectants") object to the Claim and pursuant to Bankruptcy Rule 7012 and Fed.

R.Civ.P. 12(b)(6) seek to dismiss it on the grounds that it fails to state a claim upon which relief can be granted. Alternatively, they seek summary judgment pursuant to Bankruptcy Rule 7056 and Fed.R.Civ.P. 56(c) dismissing the Claim. As fully explained below, we find that the Claim is a substitute for a cause of action by WT against Objectants to recover damages occasioned by their alleged fraud and/or misrepresentation. Accordingly, even assuming, *arguendo*, the truth of the allegations supporting the Claim (which Objectants sharply contest), as a matter of law, WT is not entitled to relief under Rule 9011 or § 1927. Moreover, WT is estopped from seeking relief under Rule 9011. As such, we dismiss the Claim to the extent it is predicated on Rule 9011 and § 1927. If WT successfully prosecutes its fraud/misrepresentation action against Objectants, it may be entitled to recover all or a portion of the attorneys fees and costs incurred in that litigation and herein as sanctions under our inherent sanction powers. Because resolution of those issues is best left to the state court, we dismiss the balance of the Claim without prejudice to WT's right to reassert it after the merits of the state court litigation are resolved.[2]

### Facts

On October 5, 1993, a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code ("Code") was filed on behalf of 72nd Street Realty Associates ("Realty" or "debtor"), a New York partnership. *See* Borenstein Aff.Ex. 4.[3] Lieb Waldman is

---

1. The request for sanctions is embodied in WT's Cross–Motion For An Order Dismissing The Bankruptcy Petition Of 72nd Street Associates And For Sanctions Against Debtor's Counsel Pursuant To Rule 9011 And The Court's Inherent Powers (the "WT Cross–Motion"). As explained below, WT has alleged several claims in support of its request for sanctions. We shall refer to them collectively as the "Claim". Objectants contend that because the Claim does not expressly designate 28 U.S.C. § 1927 as a ground for relief and only alludes to our inherent powers to sanction, we should construe the Claim as seeking relief solely under Rule 9011. We find that the Claim does invoke our inherent sanction power. Objectants are correct, however, that the Claim does not even mention § 1927. Nonetheless, because Objectants thoroughly briefed the

issue of whether sanctions are appropriate under § 1927, and have not otherwise been prejudiced, we shall treat the Claim as seeking relief under Rule 9011, 28 U.S.C. § 1927 and our inherent sanction powers.

2. Our subject matter jurisdiction of this contested matter is predicated on 28 U.S.C. §§ 1334(b) and 157(a), and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A).

3. "Borenstein Aff." refers to Abraham Borenstein's Affirmation In Opposition To Motion Of Anderson Kill Olick & Oshinsky's [sic] Motion

a partner of the debtor. His daughter, Beatrice Zaks, executed debtor's petition in her capacity as another of debtor's partners. *Id.* In paragraph 12 of her Affidavit Pursuant to Local Rule 52 annexed to the petition, she identifies debtor's two principal assets as an apartment building at 240 West 72nd Street, New York, New York (the "New York Property") and an apartment complex at 10300 Wilcrest Drive, Houston, Texas (the "Texas Property"). *Id.* At all relevant times, the New York Property was encumbered by a lien held by the Resolution Trust Company ("RTC"), as Receiver to Yorkville Federal Savings Association, predecessor to Yorkville Federal Savings Association.

David Gluck is an officer of WT. Gluck Aff. ¶ 1.[4] On or about November 5, 1988, WT purchased the Texas Property with $6.0 million borrowed from Cotten Tree Development Corp., then a wholly owned subsidiary of Seamen's Bank for Savings.[5] Gluck August Aff. ¶¶ 5–6.[6] That loan is evidenced by a note secured by a Deed of Trust and Security Agreement, Financing Agreement and an Assignment of Leases and Rents. Gluck August Aff. ¶ 7. WT defaulted under the note and in February 1992, the FDIC commenced foreclosure proceedings against the Texas Property. Sometime in late 1992 or early 1993, WT filed a chapter 11 petition in the United States Bankruptcy Court for the Eastern District of New York. That case was dismissed on the FDIC's motion.[7] When this case was commenced, the FDIC had a foreclosure sale scheduled for October 5, 1993. Gluck August Aff. ¶¶ 9–10.

Waldman and Gluck are members of the same religious community and Waldman was aware of the financial problems WT was encountering with the Texas Property. Gluck August Aff. ¶ 11. In September 1993, Waldman allegedly approached Gluck and represented to him that he could act as a consultant to resolve WT's difficulties with the FDIC in a fashion that would yield large profits to him on a sale or refinancing of the Texas Property. *Id.;* Babitt Aff. ¶ 3. To that end, Waldman introduced Gluck to Babitt. During the third week of September 1993, Waldman and Gluck met with Babitt and Hartman in Babitt's office to discuss WT's financial problems and its efforts to prevent the FDIC from selling the Texas Property. Gluck August Aff. ¶¶ 12–13; Babitt Aff. ¶¶ 2–6.

Objectants contend that Gluck and Waldman advised Babitt and Hartman (i) that WT had no equity in the Texas Property; (ii) the FDIC had scheduled state proceedings to foreclose on that property for October 5, 1993; and (iii) that Gluck believed WT could not protect the property from foreclosure by filing its own bankruptcy case due to the dismissal of WT's case in the Eastern District. Babitt Aff. ¶¶ 4–7; *see also* Hartman Aff. ¶ 2.[8] Gluck denies advising Babitt that WT could not file a petition in bankruptcy, and maintains that he did not understand the ramifications of the order dismissing that case. Gluck Aff. ¶ 21. Babitt insists that Gluck asked him to accompany Waldman to Texas to negotiate with the FDIC on Gluck's and WT's behalf, *see* Babitt Aff. ¶ 8, and that Gluck "hoped that Waldman and [Babitt]

[sic] To Be Relieved As Counsel For The Debtor And In Support Of Cross–Motion to Dismiss Debtor's Chapter 11 Petition And For Sanctions Against Debtor's Counsel.

**4.** "Gluck Aff." means the Affirmation of David Gluck, submitted in support of the Claim, dated November 23, 1994.

**5.** Seamen's was a banking institution organized under the laws of the United States, with offices in New York, New York. On April 18, 1990, the Office of Thrift Supervision declared Seamen's insolvent. Thereafter, the Federal Deposit Insurance Corporation ("FDIC") was appointed Receiver for Seamen's.

**6.** "Gluck August Aff." means the Affirmation of David Gluck submitted in support of the Claim, dated August 15, 1994.

**7.** Babitt contends that WT's chapter 11 case was dismissed by order of the United States Bankruptcy Court for the Eastern District of New York "dated April 16, 1994 [sic] ... on the ground that reorganization was not feasible." *See* Affidavit of Roy Babitt, Esq., submitted in support of the objection to the Claim, dated November 4, 1994 ("Babitt Aff.") ¶ 6.

**8.** "Hartman Aff." means the Affidavit of Lawrence Hartman, Esq., submitted in support of the objection to the Claim, sworn to November 4, 1994.

might be successful in negotiating a reorganization of the FDIC's debt that would prevent loss through foreclosure and enable Gluck to retain his interest in the [Texas] Property." *Id.* Babitt and Hartman maintain that during the meeting Gluck and Waldman advised them that if Babitt was unable to persuade the FDIC to refrain from foreclosing on the property, Gluck desired to transfer the property to an entity owned and controlled by Waldman which would then file a chapter 11 petition for reorganization. Babitt Aff. ¶ 9; Hartman Aff. ¶¶ 2–3. Babitt states that "it was agreed to by Gluck, Waldman and me that Anderson Kill would continue to represent Gluck in the negotiations with the FDIC, but that in the event that such negotiations were not fruitful, [the Texas Property] would be transferred to Waldman." Babitt Aff. ¶ 9. To that to that end, after the initial meeting with Babitt and Hartman, Waldman and Gluck met separately with Hartman allegedly "for the purpose of discussing the real estate documentation needed to achieve the transfer of [the Texas Property] from Gluck to Waldman in the event that Waldman and [Babitt] were unsuccessful in negotiating a restructuring of Gluck's debt to the FDIC." Babitt Aff. ¶ 10; *see also* Hartman Aff. ¶ 6.

By letter dated September 28, 1993, Hartman forwarded Gluck a copy of a proposed Contract of Sale transferring the Texas Property to Realty. Gluck August Aff.Ex. 1. The stated consideration therein was $200,-000 cash, plus Realty's assumption of existing liens. *Id.* The cash payment was to be borrowed by Waldman from an entity known as the Rabbinical Schoctim Center ("RSC"), pursuant to a loan secured by a mortgage on the Texas Property. Hartman Aff. ¶ 6; Gluck August Aff. ¶ 20, Ex. 3. A copy of the Contract dated September 29, 1993 ("September 29 Contract") was executed by Gluck, on WT's behalf, and Waldman, on behalf of Realty. Gluck August Aff.Ex. 1. Hartman maintains that at Gluck's direction he mailed a copy of the contract to Jimmy Nassour, Esq., an attorney in Texas who allegedly represented Gluck in other matters. Hartman Aff. ¶ 7; Objection Ex. C.[9]

Nassour denies that he received a copy of the September 29 Contract or that he was representing Gluck in connection with that agreement. Nassour Aff. ¶ 5.[10] Moreover, Gluck denies that the September 29 Contract was prepared as a back-up to the FDIC negotiations. Gluck Aff. ¶ 16. He maintains that it was "phony" and that Babbitt caused it to be drawn and executed to "mislead FDIC into believing that there was a real deal present which might persuade FDIC not to go ahead with the pending foreclosure." Gluck Aff. ¶ 17. Likewise, he insists that "[i]t was Babitt who created the strategy for his firm to type up a contract which looked real, but at the beginning was never serious, in order to induce FDIC to stop the foreclosure." *Id.*

In relevant part, the September 29 Contract states that $200,000 of the $4,065,000 purchase price is payable "[o]n the signing of the contract, by check subject to collection", with the "balance [payable] at closing." Gluck August Aff.Ex. 1. Simultaneously with the execution of the agreement, and Rider thereto, *see* Gluck Aug. Aff. Ex. 2, Realty and Gluck tendered Hartman a $200,-000 check drawn on RSC's account payable to "Anderson Kull [sic] Olig [sic] & Oshinsky" which Hartman agreed to deposit in AKOO's escrow account at Chemical Bank. *See* Hartman Aff. ¶ 8; Gluck Aug. Aff. Ex. 3. Hartman acknowledged receipt of that check, as follows:

> I have received this original check and have given same to my firm's accounting department, to be deposited in an escrow account at Chemical Bank.

Gluck August Aff.Ex. 3. Hartman failed to deposit the check in AKOO's escrow account. He explains that he "locked the $200,000 check in [his] desk because the accounting

---

**9.** "Objection" means the Objection of Anderson Kill Olick & Oshinsky, P.C., Roy Babitt and Lawrence Hartman To Motion For Sanctions Under Bankruptcy Of [sic] Rule 9011 And In Support Of Motion For Dismissal Of Claims And For Summary Judgment, dated November 4, 1994.

**10.** "Nassour Aff." means the Affidavit of Jimmy Nassour, Esq., sworn to November 23, 1994, and submitted by WT in opposition to the summary judgment motion.

department at Anderson Kill was closed for the evening", *see* Hartman Aff. ¶ 8, and that he failed to deposit it in the firm's escrow account because he became "immediately involved in a large complex matter and did not have the opportunity to complete the necessary paperwork for Anderson Kill's accounting department to open an escrow account." *Id.*

On October 4, 1993, Waldman and Babitt travelled to Texas and met with FDIC representatives in an effort to persuade the FDIC not to foreclose on the Texas Property. Gluck August Aff. ¶ 23; Babitt Aff. ¶ 12. They returned to New York later that day without an agreement. Gluck August Aff. ¶ 23; Babitt Aff. ¶ 13. Hartman contends that on October 4, 1993, he was instructed by Gluck and Waldman to return the $200,000 check to RSC and to prepare: (i) a termination of the existing contract between WT and Realty ("Termination Agreement"); (ii) a deed for the transfer of the Texas Property from WT to Realty (the "Deed"); (iii) a promissory note in the amount of $200,000 in favor of RSC (the "RSC Note"); and (iv) a mortgage in the amount of $200,000 in favor of RSC (the "RSC Mortgage"). Hartman Aff. ¶ 9. Although Gluck denies giving those instructions, *see* Gluck Aff. ¶ 85,[11] on October 5, 1993, he executed the Termination Agreement and Deed, both dated October 3, 1993, on behalf of WT. *See* Gluck August Aff.Exs. 4 and 5. Hartman allegedly did not advise Babitt that he had been asked to prepare the Termination Agreement, RSC Note or RSC Mortgage. Hartman Aff. ¶ 10; Babitt Aff. ¶ 4. Babitt maintains that he did not learn of the existence of those documents until well after debtor's plan and disclosure statement were filed. Babitt Aff. ¶¶ 16–17. Pursuant to the Termination Agreement, WT and Realty agreed "that the [September 29 Contract] is hereby terminated and is of no force and effect as between the parties thereto or otherwise." Gluck August Aff.Ex. 4. The stated consideration in the Deed for WT's transfer of the Texas Property to debtor is "[t]he sum of two hundred thousand dollars ($200,000) and the further consideration of

taking the property granted hereby subject to [the mortgage held by the FDIC] and any and all other encumbrances presently affecting such property." Gluck August Aff.Ex. 5. Later that day, debtor filed its voluntary chapter 11 petition in this Court. On or about October 12, 1993, Hartman returned the $200,000 check to RSC. Hartman Aff. ¶ 12. By order dated October 14, 1993, debtor was authorized to retain AKOO, as its bankruptcy counsel.

Gluck states that in October 1993 he realized that "WT had been left out in the cold[ ]" and that "[d]espite Babitt's assurances to me that I could hand over a Deed to the [Texas Property] and be assured of payment because Judge Roy Babitt said that I would be paid, I had received no monies." Gluck Aff. ¶ 70. Accordingly, he enlisted Nassour to assist him in negotiating a settlement. Gluck Aff. ¶ 73; Nassour Aff. ¶ 7. In this regard Gluck believed he had "documentary weapons in [his] arsenal" consisting of (i) the RSC Mortgage which he contends is flawed because it recites the existence of a $200,000 debt that did not exist; and (ii) the Deed, also allegedly "flawed on its face", because he lacked authority to authorize WT to transfer the Texas Property. Gluck Aff. ¶ 72.

Nassour wrote Hartman a letter dated October 25, 1993, which purports to memorialize a conversation among them on that date. *See* Gluck Aff.Ex. 3. In substance, and in relevant part, it makes the following points: (1) the Deed fails for lack of consideration because WT had not received any payment from debtor; (2) the Deed was executed by only one WT shareholder (i.e. Gluck) in violation of WT's by-laws; (3) debtor had withdrawn between $80,000 and $90,000 from the bank account maintained for the benefit of the Texas Property; and (4) Nassour was concerned that AKOO was representing Gluck and debtor simultaneously in connection with the transfer of the Texas Property. Finally Nassour demanded that funds allegedly removed from the accounts be returned and that the Deed be released. *Id.*

---

**11.** Alternatively, he states that even if he gave those directions, he "wouldn't expect an attorney to follow such instructions." Gluck Aff. ¶ 85.

Nassour allegedly had a telephone conversation with Hartman in early November in which Hartman allegedly advised Nassour that Gluck and Waldman had agreed that Gluck would be paid $50,000 as consideration for WT's transfer of the property and that the funds would be wired to Nassour's escrow account. Nassour Aff. ¶7. To confirm those arrangements, Hartman allegedly joined a "banker" to the conference call and Nassour allegedly gave the banker the wire instructions. Nassour Aff. ¶8. On November 3, 1993, Nassour wrote to Hartman "to memorialize and confirm [their] conversation and agreement" of that date regarding the Texas Property. *See* Gluck Aff.Ex. 4. In substance, that letter states that debtor would assume responsibility for attorneys fees totaling $11,179.50 payable by WT to AKOO; and pay WT $50,000 in certified funds. *Id.* In consideration therefor, WT agreed to provide a corporate resolution ratifying the transfer of the Texas Property to debtor (to be escrowed pending its receipt of the funds), and arrange for RSC to assign the RSC Mortgage and RSC Note to debtor. Hartman countersigned that letter. *Id.* On or about November 2, 1993, WT executed the corporate resolution and thereafter delivered it to AKOO.

The $50,000 payment was not forthcoming and Nassour allegedly telephoned Babitt to obtain an explanation of debtor's conduct. That conversation gave rise to a letter from Babitt to Nassour dated November 12, 1993. *See* Gluck Aff.Ex. 5. In relevant part, that letter states: "I have spoken with Mr. Waldman and I am authorized to tell you, in light of the commitment which I made to you and behind which I stand, that on November 18, $25,000 will be deposited in accordance with your prior instructions to Mr. Waldman, and, further, that on December 9 the remaining $25,000 will be deposited in accordance with those instructions." *Id.* Nassour responded by letter dated November 15, 1993. *See* Gluck Aff.Ex. 6. In substance, Nassour advised that he had not agreed to payment of the $50,000 in installments and that he expected full payment of the $50,000 within two days. *Id.* WT did not file a Notice of

Appearance herein. Between November 1993 and August 1994 it took no further action to collect the amounts allegedly due it under the September 29 Contract.

On or about December 30, 1993, the FDIC moved for an order dismissing the case pursuant to § 1112(b) of the Code, or, in the alternative, for an order modifying the automatic stay pursuant to § 362(d) of the Code. In support of its motion to dismiss, the FDIC argued that the case had been filed in bad faith. Debtor opposed the motion. On February 14, 1993, after taking evidence and hearing argument the Honorable Tina L. Brozman of this court,[12] denied the FDIC's motion to dismiss. At the FDIC's request, Judge Brozman deferred ruling on the motion for stay relief, pending the FDIC's review of the Plan of Reorganization filed by debtor on February 2, 1994.

On or about February 28, 1994, debtor filed an Amended Plan of Reorganization and a Disclosure Statement. Debtor filed its Second Amended Plan of Reorganization and a Second Amended Disclosure Statement on or about April 28, 1994. By order dated May 24, 1994, debtor's Second Amended Disclosure Statement was approved and June 21, 1994, was fixed as the date for the confirmation hearing on debtor's Second Amended Plan. The FDIC and RTC objected to confirmation of the plan. In connection with that objection, on July 18, 1994, Gluck was deposed by the FDIC and was represented by Nassour at the deposition. Babitt Aff. ¶29. A trial on the confirmability of the Second Amended Plan of Reorganization ("Plan Trial") was commenced on July 20, 1994. Gluck appeared in court on that date with Nassour. Babitt Aff. ¶30. Gluck did not voice an objection to the plan and did not file any pleadings in opposition thereto. *Id.* During the Plan Trial debtor reached agreement with the RTC and FDIC with respect to the treatment of their claims under a reorganization plan. Those agreements called for the sale of the Texas and New York Properties pursuant to a reorganization plan. To implement those settlements, on or

---

12. This case originally was assigned to Judge Brozman. On or about August 24, 1994, it was reassigned to me for all purposes. *See* Reassignment Of Case, dated August 24, 1994.

about August 23, 1994, debtor moved pursuant to §§ 105, 363 and 1127(a) of the Code for an order authorizing the sale of the Texas and New York Property free and clear of liens, and authorizing debtor to amend its Second Amended Plan of Reorganization. That motion was returnable September 13, 1994.

In mid August 1994, WT moved (the "August Motion") for an order:

a. dismissing debtor's chapter 11 case;

b. authorizing WT to file a proof of claim and permitting it to intervene in the case;

c. voiding WT's transfer of the Texas Property to debtor;

d. declaring that the Texas Property is property of WT and not property of debtor's estate;

e. sanctioning AKOO, Babitt and Hartman pursuant to Bankruptcy Rule 9011; and

f. granting certain discovery.

During a hearing held on August 30, 1994, WT initially sought the issuance of a temporary restraining order ("TRO") preventing debtor from selling the Texas Property. WT contended that by virtue of debtor's failure to pay WT the $200,000 cash portion of the purchase price for the Texas Property stated in the September 29 Contract, the Deed should be rescinded and the transfer avoided. August Trans. pp. 7–8.[13] During the hearing, WT explained that it sought leave to commence an adversary proceeding against debtor to adjudicate the issue of ownership of the property, and contended that the sale should be stayed for a period of fifty-five (55) days to permit it to commence that litigation,

conduct discovery and obtain a preliminary injunction hearing. August Trans. pp. 27–31. Debtor agreed to permit WT to file a claim without prejudice to its right to object to that claim. See August Trans. p. 62. All parties acknowledged that the FDIC held a first lien against the property and that there was no equity in the property. After considerable discussion and debate, WT withdrew its request for a TRO and agreed not to oppose the sale, provided it obtained discovery from the debtor regarding the operation of the property and its efforts to market the property; the brokerage commissions to be paid under the agreement were escrowed and not paid without further order of the court; and it be permitted to attempt to find buyers willing to pay more for the property. See August Trans. p. 74.[14]

On September 13 and 16, 1994, we conducted a hearing on debtor's request to sell the Texas Property. During that hearing Waldman testified on debtor's behalf. On September 16, 1994, WT commenced an adversary proceeding (the "September Adversary Proceeding") to set aside the transfer of the Texas Property to debtor. WT also objected to the motion to sell the property on the grounds that debtor's title was voidable and that debtor had failed to prove that the offer was the highest and best one available or that the proposed purchaser was a purchaser in good faith for purposes of § 363(m) of the Code. On September 23, 1994, we denied debtor's motion to sell the Texas Property and granted the FDIC's motion for relief from the automatic stay, without prejudice to WT's right to press its claim to the Texas Property in state court. See Septem-

13. "August Trans." means the transcript of the hearing conducted herein on August 30, 1994. A copy of that document was submitted by WT in opposition to the summary judgment motion. See Supplemental Affirmation of Abraham Borenstein In Opposition To Motion Of Anderson Kill Olick & Oshinsky's [sic] Motion [sic] To Be Relieved As Counsel And In Support of Cross–Motion To Dismiss Debtor's Chapter 11 Petition And For Sanctions Against Debtor's Counsel, Ex. 2.

14. The RTC appeared through counsel at the August 30 hearing. Counsel advised that although the RTC had reached an agreement in

principle with debtor regarding the disposition of the New York Property and satisfaction of its claim, final approval of that transaction would not be forthcoming unless debtor provided certain information it had requested. Counsel specifically advised that if that information was not forthcoming the RTC would object to the sale. Ultimately debtor failed to provide the RTC with the required information and we denied debtor's request to sell that property. By order dated January 10, 1995, we granted the RTC relief from the automatic stay to foreclose on the New York Property.

ber 23 Trans. pp. 3–15.[15] On or about October 16, 1994, WT voluntarily dismissed the September Adversary Proceeding. We scheduled a status conference on the balance of the August Motion for October 18, 1994. On October 7, 1994, AKOO moved for an order authorizing it to withdraw as debtor's counsel and made the motion returnable on October 18, 1994. WT objected to that motion and filed the WT Cross–Motion. Ultimately, WT withdrew its objection to AKOO's motion to withdraw as counsel and we granted it. By order dated December 22, 1994, we converted the case to one under chapter 7 of the Code.

### Discussion

WT contends that an award of sanction is warranted herein based upon the following allegations:

*Allegation 1:* AKOO simultaneously represented WT and Waldman/debtor. Borenstein Aff. ¶¶ 9–12.

*Allegation 2:* Babitt executed debtor's chapter 11 petition knowing that it contained false information. Borenstein Aff. ¶¶ 13–15.

*Allegation 3:* Babitt knowingly executed a false affidavit in support of debtor's application to retain AKOO as bankruptcy counsel herein. Borenstein Aff. ¶¶ 16–23.

*Allegation 4:* Babitt caused debtor to file false Schedules. Borenstein Aff. ¶ 24.

*Allegation 5:* Babitt knowingly executed and filed a false disclosure statement on behalf of debtor. Borenstein Aff. ¶ 25.

*Allegation 6:* AKOO failed to protect debtor in possession bank accounts. Borenstein Aff. ¶¶ 26–45.

*Allegation 7:* Babitt and AKOO materially misrepresented facts regarding the existence of a $90,000 escrow account. Borenstein Aff. ¶¶ 46–56.

■ In addition to arguing that the Claim should be dismissed pursuant to Rule 12(b)(6), Objectants urge that it must be dismissed because Gluck lacks standing to assert it. *See* Objectants' Mem. pp. 33–34.[16] We find no merit to that contention because WT, not Gluck, is seeking sanctions, and Objectants have not challenged WT's standing to do so. Equally meritless is Objectants' assertion that the Claim should be dismissed because Gluck's father is an indispensable party who has not been joined in the Claim. Objectants' Mem. p. 34. Although the evidence reveals that Gluck's father is a shareholder of WT, *see* Objection Ex. A, Objectants have failed to show how that makes him an indispensable party to the Claim.

■ Bankruptcy Rule 7012 incorporates Fed.R.Civ.P. 12 by reference. Rule 12(b)(6) provides that a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." In applying Rule 12(b)(6) to the Claim, we must accept as true all of the well-pleaded facts. *See, e.g., Square D Co. v. Niagara Frontier Tariff Bureau,* 476 U.S. 409, 411, 106 S.Ct. 1922, 1924, 90 L.Ed.2d 413 (1986); *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57 (2d Cir.1985). Our function "is not to weigh the evidence that might be presented at trial but merely to determine whether the [Claim] is legally sufficient." *Festa v. Local 3 Int'l Bhd. of Elec. Workers,* 905 F.2d 35, 37 (2d Cir.1990). The motion to dismiss should not be granted unless it appears with certainty that no set of facts could be established at trial which would entitle WT to any relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Fed.R.Civ.P. 56(c) states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)); *Anderson v. Liberty Lobby,*

---

**15.** "September 23 Trans." means the transcript of the hearing conducted herein on September 23, 1994.

**16.** "Objectants' Mem." means the Memorandum Of Law In Support Of Objection To Sanctions Motion And Motion For Dismissal Of Claims And Summary Judgment, filed on behalf of Objectants.

*Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). It is made applicable herein by Bankruptcy Rule 7056. In assessing the merits of a summary judgment motion, the court must view the record in the light most favorable to the non-moving party. *See Nat'l Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 203 (2d Cir.1989); *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559 (2d Cir.1989); *Lund's Inc. v. Chemical Bank*, 870 F.2d 840, 844 (2d Cir.1989). The court's function is to determine "[w]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 251–52, 106 S.Ct. at 2512. Movant must prove that no material facts are in dispute. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Heyman v. Commerce & Industry Ins. Co.*, 524 F.2d 1317, 1319 (2d Cir. 1975). Thereafter, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. at 250, 106 S.Ct. at 2511 (quoting Fed.R.Civ.P. 56(e)). From the recitation of the facts herein and a review of the Local Rule 13(h) statements submitted on behalf of Objectants and WT, respectively, it is apparent that there are disputed facts. Nonetheless, as a matter of law, WT is not entitled to relief under Rule 9011 or 28 U.S.C. § 1927. Accordingly, judgment dismissing the Claim pursuant to Rule 12(b)(6) is appropriate to the extent it seeks relief under those provisions.

*Bankruptcy Rule 9011 Sanctions*

Bankruptcy Rule 9011 provides for sanctions against an attorney who signs a pleading that contains misstatements of fact which the attorney knew were untrue or after reasonable inquiry would have learned were untrue, or for which there is no cause of action based on existing law and no reasonable extension or distinction of existing law would serve as a basis for the cause of action. The rule tracks the language of Fed.R.Civ.P. 11, as it existed prior to its amendment effective December 31, 1993.[17] Accordingly, in interpreting it, the case law developed under former Rule 11 is instructive. *See, e.g., Baker v. Latham Sparrowbush Assocs. (In re Cohoes Industrial Terminal, Inc.)*, 931 F.2d 222, 227 (2d Cir.1991); *Cohn v. United States Trustee (In re Ostas)*, 158 B.R. 312, 320 n. 13 (N.D.N.Y.1993); *United of Omaha Life Ins. Co. v. LJAK Assocs. (In re LJAK Assocs., Inc.)*, 165 B.R. 9, 11 (Bankr.E.D.N.Y.1994); *In re Food Workshop, Inc.*, 70 B.R. 962, 966 (Bankr.S.D.N.Y.1987).[18] Under Rule 9011,

---

**17.** The rule states, as follows:

> The signature of an attorney ... constitutes a certificate that the attorney ... has read the document; that to the best of the attorney's ... belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law ... and that it is not interposed ... to harass or cause unnecessary delay or needless increase in the cost of the litigation or the administration of the case.

Bankruptcy Rule 9011. As amended, Rule 11 extends possible sanctions against attorneys who, although they have not signed a pleading, advocate or advance unsubstantiated facts or baseless causes of action contained in a signed pleading. The rule now provides, in relevant part:

> (b) Representations to Court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,
> (1) It is not being presented for any improper purpose, such as to harass or to cause unnec-

essary delay or needless increase in the cost of litigation;
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Fed.R.Civ.P. 11.

**18.** Professor King discusses the impact of the amendment to Rule 11 and the applicability of pre-amendment case law in interpreting Rule 9011, as follows:

> Prior to its amendment, the judicial interpretations of Civil Rule 11 were of significant importance in guiding the courts deciding cases under Bankruptcy Rule 9011. In the future,

the signing of any document (i) unfounded in law or fact; or (ii) for the purpose of harassment, delay or increase in the cost of litigation or administration of the case is sanctionable conduct. *See United States v. Int'l Bhd. of Teamsters,* 948 F.2d 1338, 1344 (2d Cir. 1991) ("The cornerstone of Rule 11 is the certification requirement; that is Rule 11 sanctions must be based on the signature of an attorney or client on a pleading, motion or other paper filed in a lawsuit." (citation omitted)); *Oliveri v. Thompson,* 803 F.2d 1265, 1274 (2d Cir.1986) ("The key to Rule 11 lies in the certification flowing from the signature to a pleading motion, or other paper in a lawsuit.... [The rule] deals with the signing of particular papers in violation of the implicit certification invoked by the signature."), *cert. denied sub nom. County of Suffolk v. Graseck,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). Sanctions may only be imposed upon the individual attorney who signs the paper and not on the attorney's law firm. *Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989), *on remand sub nom. Calloway v. Marvel Entertainment Group,* 907 F.2d 145 (2d Cir.1990), *on remand sub nom. Estate of Calloway v. Marvel Entertainment Group,* 138 F.R.D. 646 (S.D.N.Y. 1991), *aff'd in part, vacated in part sub nom. Estate of Calloway ex rel. LMN Prods. v. Marvel Entertainment Group,* 9 F.3d 237 (2d Cir.1993), *cert. denied sub nom. LeFlore v. Marvel Entertainment Group,* — U.S. —, 114 S.Ct. 1829, 128 L.Ed.2d 459 (1994). *See also In re Vantage Steel Corp.,* 125 B.R. 880 (Bankr.S.D.N.Y.1991) (sanctions may be imposed only on the attorney who signed the unwarranted pleading, and may not be imposed on the attorney's law firm).

 During argument WT conceded that as a matter of law Rule 11 sanctions do not lie against AKOO. It also conceded that Hartman did not sign any of the allegedly defective documents. Alleged litigation misconduct that does not involve the execution of a document is not sanctionable under Rule 11. *See McMahon v. Shearson/American Express, Inc.,* 896 F.2d 17, 22 (2d Cir.1990) (Rule 11 "does not license a district court to sanction any action by an attorney or party it disapproves of.... Imposition of sanctions must be based on a pleading, motion or other paper signed and filed in federal court...." (citations omitted)); *F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1268 (2d Cir.1987) (Rule 11 "[does not] provide a mechanism for imposing sanctions for any and all improper conduct of a party or its counsel during litigation"). Thus, judgment dismissing the Claim is granted to the extent WT seeks redress against AKOO under Rule 9011, and to sanction Hartman and Babitt under Rule 9011 on account of the matters raised in Allegations 1, 4, 6 and 7.

 Gluck states that WT's purpose in seeking sanctions is "to redress its losses" and "to vindicate the [bankruptcy] system". Gluck Aff. ¶ 93. WT proclaims that "as a private attorney general [it] seeks to vindicate this court's authority and dignity" and that "[i]f WT doesn't take the time and expense to bring these issues to the Court's attention, AKOO, Babitt and Hartman will continue—undeterred—to practice law as *they* want to, and not as the rules and society require." WT Memorandum p. 56, n. 4. (emphasis in original).[19] The concept of the "private attorney general" apparently was first articulated in *Associated Industries of*

however, because Bankruptcy Rule 9011 was not amended to conform to the 1993 amendments to Rule 11, *precedents which are developed under the amended rule will probably be of little practical utility in interpreting Rule 9011* unless, for some reason, the courts interpreting Rule 9011 ameliorate some of its rigor by using the less draconian lens of the amended Rule 11. In the meantime, totally different rules governing attorney conduct will apply in Bankruptcy cases and district court litigation. *It would seem that precedents developed under Rule 11 as it existed prior to December 1, 1993 will continue to be of utility in interpreting Rule 9011.* It would also seem appropriate for the courts to continue to interpret the Bankruptcy Rule in a way which honors the philosophy which underlay it when it was promulgated, unless and until the Bankruptcy rule is amended.

9 *Collier on Bankruptcy,* ¶ 9011.02 at 9011–6 to 9011–7 (Lawrence P. King et al. eds., 15th ed.1994) (emphasis added) (footnotes omitted).

**19.** "WT Memorandum" means the Memorandum Of Law In Opposition To Motion For Dismissal of Claims And For Summary Judgment, filed on behalf of WT.

*New York State v. Ickes*, 134 F.2d 694, 704 (2d Cir.), *vacated as moot*, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943), where the court determined that Congress could constitutionally confer upon private individuals through a federal statutory provision the "authority to bring a suit to prevent an action by an officer in violation of his statutory powers ... even if the sole purpose is to vindicate the public interest." The court dubbed those individuals "private Attorney Generals." *Id.*[20] Since then, that concept has been incorporated in legislation to confer standing on aggrieved individuals to enforce federal statutes and thereby redress injuries not remedied by government regulatory action. *See, e.g.*, Federal Water Pollution Control Act Amendments of 1972 § 505, 33 U.S.C.A. § 1365 (West 1995) (authorizing suits by persons with an interest adversely affected by a violation of the Act); Investment Company Act of 1940 § 36(b) as amended, 15 U.S.C.A. § 80a–35(b) (West 1995) (permitting security holder of investment company to bring action under this subsection on behalf of the company against an investment adviser who breaches his fiduciary duty with respect to compensation by the investment company or its shareholders); Racketeer Influenced and Corrupt Organizations Act § 1964(c), 18 U.S.C.A. § 1964(c) (permitting any person whose business or property in injured by another's violation of § 1962 of the Act to sue in district court and recover treble damages, costs and fees). It has been used by the judiciary to justify awarding fees to a litigant who sues to enforce a federal statute granting or protecting federal rights, but this doctrine is limited to instances where Congress has statutorily authorized such fee awards. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 263–64, 95 S.Ct. 1612, 1624–25, 44 L.Ed.2d 141 (1975). It has also been applied in the class action context. *Cf. Deposit Guaranty Nat. Bank v. Roper*, 445 U.S. 326, 338–39, 100 S.Ct. 1166, 1174, 63 L.Ed.2d 427 (1979) (the legal system's increasing reliance on the "private attorney general" to vindicate legal rights has created the financial incentive for attorneys to bring cases as class actions for a contingent fee). *See generally* Bryant Garth, Ilene H. Nagel & S. Jay Plag-

---

**20.** In *Associated Industries*, a membership corporation interested in preserving lower coal prices challenged orders issued by the Department of the Interior's Bituminous Coal Commission which effectively raised minimum coal prices in New York State. Petitioner sought judicial review of those orders pursuant to § 6(b) of the Bituminous Coal Act of 1937, 15 U.S.C. §§ 828 et seq. (expired August 24, 1943), arguing, among other things, that the Commission acted beyond the scope of the power conferred on it under the Act. Although the Act specifically authorized any person aggrieved by an order issued by the Commission to seek review in a United States Court of Appeals, the Commission sought to dismiss the petition on the grounds that the petitioners lacked standing to sue. In denying that motion, the court first summarized the concept of standing as follows:

> In a suit in federal court by a citizen against a government officer, complaining of alleged past or threatened future unlawful conduct by the defendant, there is no justiciable 'controversy,' without which under Article III, § 2 of the Constitution, the court has no jurisdiction, unless the citizen shows that such conduct or threatened conduct invades or will invade a private substantive legally protected interest of the plaintiff citizen; such invaded interests must be either of a 'recognized' character, at 'common law' or a substantive private legally protected interest created by statute.

134 F.2d at 700. The court then suggested the theory of a "private attorney general," as follows:

> While Congress can constitutionally authorize no one, in the absence of an actual justiciable controversy, to bring a suit for the judicial determination either of the constitutionality of a statute or the scope of powers conferred by a statute upon government officers, it can constitutionally authorize one of its own officials, such as the Attorney General, to bring a proceeding to prevent another official from acting in violation of his statutory powers; for then an actual controversy exists, and the Attorney General can properly be vested with authority in such a controversy, to vindicate the interest of the public or the government. Instead of designating the Attorney General, or some other public officer, to bring such proceedings, Congress can constitutionally enact a statute conferring on any non-official person, or on a designated group of non-official persons, authority to bring a suit to prevent an action by an officer in violation of his statutory powers; for then in like manner there is an actual controversy, and there is nothing constitutionally prohibiting Congress from empowering any person, official or not, to institute a proceeding involving such a controversy, even if the sole purpose is to vindicate the public interest. Such persons, so authorized, are, so to speak, private Attorney Generals.

134 F.2d at 704.

er, *The Institution of the Private Attorney General: Perspectives From An Empirical Study of Class Litigation*, 61 S.Cal.L.Rev. 353 (1988).

WT's application of the concept apparently is unprecedented. WT assumes that it has the right to seek Rule 11 sanctions in any case—irrespective of whether it is aggrieved by the defective pleading, or even whether it is party to, or has an interest in, the underlying litigation. It contends that its alleged inherent power to redress Rule 11 violations gives it the status of a "private attorney general". *See* Hearing Trans. pp. 40–45, 51, 54–55.[21] WT has not cited any support for that assertion and we are not aware of such authorities.[22] Rule 11 does not create an independent cause of action. *See, e.g., Port Drum Co. v. Umphrey*, 852 F.2d 148, 150–51 (5th Cir.1988). Further "as a general rule only parties to an action and certain other participants have standing to move for rule 11 sanctions". *New York News, Inc. v. Kheel*, 972 F.2d 482, 488–89 (2d Cir.1992) (citing *Westlake North Property Owners v. Thousand Oaks*, 915 F.2d 1301, 1307 (9th Cir.1990) (movants denied standing to seek sanctions because they were not parties to underlying action); *Port Drum Co. v. Umphrey*, 852 F.2d at 150–51 & nn. 2–3

(under certain circumstances non-party witness may be permitted to seek Rule 11 sanctions)). Without more, WT's professed goal of protecting the court and society from Objectants' alleged violation of Rule 11 does not vest it with standing to assert the Claim. *See New York News, Inc. v. Kheel*, 972 F.2d at 487–88.

To be sure, WT is an interested party and allegedly has been aggrieved by Objectants' actions. However, its real goal is not to punish Objectants for filing false or misleading papers. At best, that is an incidental end in making the Claim. Among other things, WT has requested compensatory damages of $200,000 (calculated as the amount it was to be paid under the September 29 Contract) plus reimbursement of the legal fees and expenses it allegedly has incurred in connection with this litigation which it maintains totals at least $50,000. *See* Gluck Aff. ¶ 93 a., b. That fact, coupled with WT's delay in seeking relief until the potential for a sale of the Texas Property became a reality, demonstrates that the Claim is merely a proxy for a lawsuit against Objectants to recover damages arising out of their alleged fraud/misrepresentation. However, Rule 11 sanctions are intended to fulfill

---

**21.** "Hearing Trans." means the transcript of the hearing on the objection to the Claim.

**22.** Courts that have likened a party seeking Rule 11 sanctions to a private attorney general have done so in clearly distinguishable cases. None support WT's theory. For example, in *Alpern v. Lieb*, 11 F.3d 689 (7th Cir.1993), the court held that the pre-petition, post-petition appeal of an order assessing Rule 11 sanctions against a chapter 7 debtor was exempted from the automatic stay by § 362(b)(4) of the Code. The court reasoned that the Rule 11 sanction is meted out by a governmental unit, i.e. the court, and that "[t]he private enforcer, sometimes called a 'private attorney general,' can be viewed as an agent of the 'governmental unit' ... that promulgated Rule 11 in order to punish unprofessional behavior." 11 F.3d at 690. In *Eastway Constr. Corp. v. City of New York*, 637 F.Supp. 558 (E.D.N.Y.1986), *modified*, 821 F.2d 121 (2d Cir.), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), plaintiff commenced an action against municipal defendants claiming violation of its civil rights and applicable antitrust laws because the municipal defendants, pursuant to statute, had ceased entering into public housing rehabilitation contracts with contractors whose principals controlled firms that were in arrears or had default-

ed on loans from the City. *Id.* at 562. Because Eastway's principals controlled limited partnerships which either were in default or had incurred substantial arrearage on municipal loans, Eastway was unable to secure work on publicly or privately financed rehabilitation projects. *Id.* at 563. The district court granted defendants' motions for summary judgment but denied their motions for fees finding that plaintiff's claims were not frivolous. The Second Circuit affirmed the dismissal but remanded the issue of attorney's fees to the district court. On remand, the court held that the costs incurred in defending the civil rights claim would be assessed against plaintiff under 42 U.S.C. § 1988 while costs incurred in defending the antitrust claim would be assessed against plaintiff and/or counsel under Rule 11. *Id.* Among the issues considered by the court was whether defendants were entitled to be compensated for the time spent in making the Rule 11 motion. The court likened a party seeking sanctions to "a private attorney general, enforcing the federal policy of deferring frivolous suits," and held that fees should be recovered in order not to discourage parties from bringing warranted Rule 11 motions. *Id.* at 575.

a deterrent, rather than compensatory, function by discouraging future violations of the rule. *E.g., Thomas v. Capital Sec. Servs., Inc.,* 836 F.2d 866, 877 (5th Cir.1988); *Anschutz Petroleum Marketing Corp. v. E.W. Saybolt & Co.,* 112 F.R.D. 355 (S.D.N.Y. 1986). The rule is not intended " 'to reward parties who are victimized by litigation'." *New York News, Inc. v. Kheel,* 972 F.2d at 488 (quoting *Business Guides v. Chromatic Communications Enterprises,* 498 U.S. 533, 553, 111 S.Ct. 922, 934, 112 L.Ed.2d 1140 (1991)). Nor is it a substitute for an action against Objectants for damages on account of their alleged misrepresentation or fraud. *Compare In re Omega Trust,* 110 B.R. 665, 675 (Bankr.S.D.N.Y.) (cost of loss of services suffered by debtor by reason of improperly filed chapter 7 case not imposed as a sanction under Rule 9011), *aff'd in part, remanded in part,* 120 B.R. 265 (S.D.N.Y.1990).[23] As a matter of law, the Claim fails to state a claim for relief under Rule 9011.

■ In *In re Cohoes Industrial Terminal, Inc.,* 931 F.2d at 229–30, the court held that a party who failed to move to dismiss a chapter 11 case or otherwise alert the court to its alleged frivolity was estopped from later seeking an award of Rule 9011 sanctions on the grounds that the case was wrongfully filed. *See also In re French Bourekas, Inc.,* 175 B.R. 517, 523 (Bankr. S.D.N.Y.1994) (creditor who waited fifteen (15) months before seeking to dismiss chapter 11 case waived right to seek Rule 9011 sanctions); *compare In re Eatman,* 182 B.R. 386 (Bankr.S.D.N.Y.1995) (sanctions under 28 U.S.C. § 1927 and 11 U.S.C. 105(a) awarded to creditor who successfully sought dismissal of chapter 13 case one week after petition was filed). As WT's agent, Gluck had knowledge of the pendency of this chapter 11 case on the day it was filed. He questioned the validity of the Termination Agreement and Deed on the day he executed them, and through Nassour, in October 1993, he formally raised those issues with AKOO, as well as issues relating to AKOO's alleged dual representation of WT and debtor and Waldman's alleged misuse of funds derived from the operation of the Texas Property. *See* Gluck Aff. Ex. 3. WT acknowledges that by the end of November 1993, Babitt had ceased providing any assistance regarding that matter. *See, e.g.,* Nassour Aff. ¶¶ 21–22. Nonetheless, (i) WT did not file a notice of appearance herein; (ii) in July 1994, Gluck gave deposition testimony to the FDIC and apparently did not alert the FDIC to the alleged defects in debtor's title to the Texas Property, or his belief that Babitt and Waldman had attempted to defraud the FDIC in September 1993; (iii) WT and its counsel attended the Plan Trial, but did not formally or informally challenge the plan or the adequacy of debtor's disclosure statement or advise the court of the alleged defects in debtor's title to the Texas Property; and (iv) WT waited approximately nine (9) months before taking action herein. WT cannot account for its inaction. Assuming, *arguendo,* that the Claim is not barred as a matter of law, under these facts WT is estopped from seeking Rule 11 sanctions herein. *In re Cohoes Industrial Terminal, Inc.,* 931 F.2d at 229–30; *In re French Bourekas, Inc.,* 175 B.R. at 523.

### 28 U.S.C. § 1927

■ Section 1927 states that [a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fee reasonably incurred because of such conduct.

28 U.S.C. § 1927. In this Circuit it is settled that in appropriate circumstances a bankruptcy court can impose sanctions under § 1927. *See In re Cohoes Industrial Terminal, Inc.,* 931 F.2d at 230; *see also In re French Bourekas, Inc.,* 175 B.R. at 523 (bankruptcy court may impose sanctions under § 1927); *In re Wonder Corp. of America,* 109 B.R. 18, 27–28 n. 11 (Bankr.D.Conn.1989) (same). The statute "does not distinguish between winners or losers, or between plain-

---

**23.** WT concedes as much, although it mistakenly contends that it is entitled to relief under Rule 9011 in its capacity as a "private attorney general". WT Memorandum p. 56, n. 4.

tiffs and defendants. [It] is indifferent to the equities of a dispute and to the values advanced by substantive law. It is concerned only with limiting the abuse of court processes." *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 762, 100 S.Ct. 2455, 2462, 65 L.Ed.2d 488 (1980). It is intended "to deter unnecessary delays in litigation." H.R. Conf. Rep. No. 1234, 96th Cong., 2d Sess. 8, *reprinted in* 1980 U.S.C.C.A.N. 2716, 2782; *see United States v. International Bhd. of Teamsters,* 948 F.2d at 1345; *United States v. Shuch,* 139 B.R. 57, 63 (D.Conn.1992). Thus, the statute "looks to unreasonable and vexatious multiplications of proceedings; and it imposes an obligation on attorneys throughout the entire litigation to avoid dilatory tactics." *United States v. International Bhd. of Teamsters,* 948 F.2d at 1339. WT's objection is not with respect to the manner in which Objectants have conducted litigation in this case. Its complaint is that by reason of Objectants' alleged misrepresentation and/or fraud it was cheated out of the Texas Property. Thus, WT does not seek to sanction Objectants for unreasonably or vexatiously multiplying the litigation herein. Rather, it aims to punish them for their alleged fraud, and the alleged fraud on this court. However, § 1927 is not broad enough to reach "acts which degrade the judicial system," including "attempts to deprive the court of jurisdiction, fraud, misleading and lying to the Court". *NASCO, Inc. v. Calcasieu Television and Radio, Inc.,* 124 F.R.D. 120, 138–39 (W.D.La. 1989), *aff'd,* 894 F.2d 696 (5th Cir.1990), *aff'd sub nom. Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *see also GRiD Sys. Corp. v. John Fluke Mfg. Co.,* 41 F.3d 1318 (9th Cir.1994) (district court abused its discretion in awarding attorneys fee sanctions under § 1927 where unreasonable and vexatious conduct occurred in entirely separate state court action). Accordingly, as a matter of law, WT is not entitled to relief under § 1927.

*The Inherent Power of the Court*

■■■ The court's inherent power to sanction parties "stems from the very nature of courts and their need to be able to 'man-age their own affairs so as to achieve the orderly and expeditious disposition of cases'." *United States v. Int'l Bhd. of Teamsters,* 948 F.2d at 1345 (quoting *Chambers v. NASCO, Inc.,* 501 U.S. at 43, 111 S.Ct. at 2132, 115 L.Ed.2d 27 (1991)). A court is empowered to assess costs and fees against an attorney and/or his client where a party acts in bad faith, vexatiously, wantonly or for oppressive reasons. *See Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. at 258–59, 95 S.Ct. at 1622; *see also Oliveri v. Thompson,* 803 F.2d at 1272 (court's exercise of its inherent sanction power creates an exception to the American Rule that parties bear their own fees and expenses of litigation; in appropriate circumstances, fees and expenses may be awarded against the losing party or its attorney). A federal court can invoke its inherent powers if it determines " 'that fraud has been practiced upon it, or that the very temple of justice has been defiled.' " *Chambers v. NASCO, Inc.,* 501 U.S. at 46, 111 S.Ct. at 2123 (quoting *Universal Oil Products Co. v. Root Ref. Co.,* 328 U.S. 575, 580, 66 S.Ct. 1176, 1179, 90 L.Ed. 1447 (1946)).

■■■ Assuming, *arguendo,* that WT could establish that Objectants have utilized this court to further a scheme to defraud it, WT might state a case for recovering the costs expended in proving the fraud as sanctions under our inherent powers. However, resolution of WT's fraud allegations will have no impact on the debtor, its estate or creditors. Thus, it would be a waste of judicial resources for this court to adjudicate the merits of those claims. Moreover, WT's dispute with Objectants arises under state law. Absent the filing of this bankruptcy case we would lack jurisdiction to adjudicate any aspect of it. Accordingly, we dismiss this final aspect of the Claim without prejudice to WT's right to refile it, in the event it is able to establish the merits of its state law claims against Objectants. *See generally* 28 U.S.C. § 1334(c)(1); *Matter of Chicago, Milwaukee, St. Paul & Pacific R.R. Co.,* 6 F.3d 1184, 1189 (7th Cir.1993) (listing twelve (12) factors relevant to determination of whether abstention under § 1334(c)(1) is appropriate).[24]

---

24. As part of its response to the Claim objection, WT has asked that we sanction Objectants pursu-ant to Rule 11, § 1927 and our inherent powers, for filing it. *See* WT Memorandum pp. 52–54.

## Conclusion

Based on the foregoing, the Claim is dismissed to the extent WT seeks relief under Rule 9011 and 28 U.S.C. § 1927. The balance of the Claim is dismissed, without prejudice.

SETTLE ORDER.

There is no basis for sanctioning Objectants under § 1927 or our inherent powers because we have concluded that the objection should be substantially granted and because Objectants have not unnecessarily delayed this litigation or acted in bad faith, wantonly or for oppressive reasons. None of the six (6) alleged Rule 11 violations are actionable and only one warrants comment. In support of its objection to the Claim, Objectants cited WT's execution and delivery of the corporate resolution ratifying WT's transfer of the Texas Property to RSC as evidence of Gluck's alleged acquiescence that AKOO "would represent him only in negotiations with the FDIC and in the anticipated transfer of the [Texas] Property should those negotiations prove unsuccessful and that [AKOO] would represent [Reality] in any subsequent Chapter 11 case." Objection ¶ 26, Ex. F. WT correctly notes that the ratification was delivered in escrow pending its receipt of a $50,000 settlement payment, and thus did not become effective. WT Memorandum pp. 53–54. Objectants contend that the ratification was inadvertently included in the objection by an attorney who was not fully aware of the facts in this matter. *See* Objectants' Reply Memorandum To WT Associates' Opposition To Anderson Kill's Motion To Dismiss And For Summary Judgment, p. 3 n. 2. Because Objectants promptly acknowledged their error and have advanced a plausible explanation for their mistake in utilizing the document, there is no basis for sanctioning them under Rule 11.